# 2002
# NEGOTIATED AGREEMENT

# FORT HOOD

"people first – mission always"



*"Working together Works"*

# AFGE

PROUD TO MAKE AMERICA WORK

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
AFL-CIO

LOCAL, 1920



## ARTICLE 4

## MANAGEMENT RIGHTS

<u>Section 1</u>.  The employer retains the following rights in accordance with PL 95-454 (Section 7106):

a.  To determine the mission, budget, organization, number of employees, and internal security practices of the agency.

b.  In accordance with applicable laws, to hire, assign, direct, lay off, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

c.  To assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

d.  With respect to filling positions, to make selections for appointments from:

(1)  among properly ranked and certified candidates for promotion; or

(2)  any other appropriate source; and

e.  To take whatever actions may be necessary to carry out the agency mission during emergencies.  Nothing in this agreement shall preclude negotiation at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work.

f.  And to afford the union the opportunity to negotiate

(1)  procedures which management officials of the agency will observe in exercising any authority under this section; or

(2)  appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

<u>Section 2</u>.  In the administration of all matters covered by this agreement, officials and employees are governed by existing or future laws and government wide and agency regulations at the time this agreement is approved.  In the event there is a conflict between this agreement and future government wide and agency regulations, the contract shall be brought into conformance subject to the procedures outlined in Article 3, Section 7 of this agreement.

USA-Alvarez-001795

appropriate regulations.  No material such as that listed in Section 7 of this article may be placed in the Official Personnel Folder (OPF) or in other files unless the employee receives a copy.  Receipt of documents will be reflected by signature rather than initials.

Section 2.  No entry will be made in the OPF or other personnel files which reflects adversely upon an employee or his career without the employee's knowledge. Dissatisfaction by the employee arising from such entries may be resolved under the negotiated grievance procedure.  Employees will be given an opportunity to review all material relied upon prior to the employer taking an adverse action.

Section 3.  Employees will be given a copy of each document generated by the employer which will be placed in their OPF or retained by the supervisor.

Section 4.  Unless prohibited by appropriate regulations, each employee (or representative if designated in writing and authorized by the employee in writing) may inspect his OPF, and other personnel files pertaining to him. Such inspection would normally be on duty time if the employee is otherwise in a duty status.  The employer will not pay overtime or travel expenses arising from such inspections or requests. Requests to review OPFs will be honored expeditiously.

Section 5.  The employer will have due regard to the provisions of appropriate regulations, in the release of information from an OPF on an employee of the unit.

Section 6.  Letters of reprimand will be removed from the OPF upon expiration of the specified time limits of the actions.  Records of actions determined by appeal or grievance decision to be unfounded will be removed immediately from the OPF and will not be used as a factor in connection with future personnel actions including promotions.

Section 7.  Letters of caution or warning will be destroyed 1 year after the date of the letter, or sooner by mutual agreement, provided that no other letters of caution or warning were issued while this letter was in effect.

Section 8.  Employee requests for review of records (OPF review) should be met within a reasonable time (normally 2 weeks).

Section 9.  Infractions that could lead to discipline should be discussed with employees promptly.  Such meetings should be documented with a copy furnished to the employee.  This does not apply to fraud, waste, abuse or other illegal activities.

## ARTICLE 15

### JOB CLASSIFICATION/DESCRIPTION

Section 1.  Employees who believe their job descriptions are not accurate should discuss the situation with their supervisors.  Employees should be included in the process of developing draft job descriptions for their position by either assisting in the development of the drafts or by providing information to the supervisors.  Employees

USA-Alvarez-001796

should agree that the job descriptions describe the major duties and responsibilities they are required to perform. Usually the final decision as to duty assignment is made by the immediate supervisor. After this process is complete, it will be submitted to CPAC to be processed though proper channels for classification.

Section 2. When an employee alleges inequities in his position description or classification, he shall be furnished, upon request to CPAC, information on the appeal rights and procedures set forth in applicable regulations. He may elect to be represented by a union representative in discussing the matter with management or in presenting an appeal.

Section 3. The employer agrees to provide each employee with a copy of the job description to which the employee is assigned. The job description provided shall be accurate and realistically reflect the major duties which the employee is expected to perform.

Section 4. An employee may initiate a classification appeal over the proper classification of his/her position. Wage Grade (WG) employees must make their appeal through the agency. General Schedule (GS) employees have the option of appealing through the agency or proceeding directly to the Office of Personnel Management (OPM).

## ARTICLE 16

## TRAINING

Section 1. The employer and the union agree that the training and development of the employees within the unit is a matter of primary importance to the parties. The parties shall seek the maximum training and development of all employees required to meet the needs in support of present and future mission requirements. The employer agrees to provide on-the-job training, New Equipment Training (NET) and fair distribution of training for employees and paying such training expenses in accordance with applicable laws, rules, and regulations as deemed appropriate. The union shall be entitled to appoint one member to any Fort Hood Training Committee.

Section 2. The parties agree that the following principles apply to all training programs within the unit of recognition:

a. When training is given primarily to prepare employees for advancement and is required for promotion (i.e., an employee is not eligible for promotion unless he has completed the training), the training will be made under competitive promotion procedures.

b. The employer will identify situations in the specific work environment where training can aid in achieving defined objectives and goals.

c. Supervisors will assure that skills and knowledge obtained through government-sponsored training are used to the maximum extent possible.

USA-Alvarez-001797

## ARTICLE 39

## ASSIGNMENT OF WORK/DETAILS

Section 1.  The employer agrees that employees will be assigned to work, which is appropriate to their position descriptions taking into account the mission of the agency.

Section 2.  The employer will furnish each employee a copy of the employee's position description and any changes when made.

Section 3.  As prescribed by OPM and appropriate regulations, a detail is defined as a temporary assignment of an employee to a different position or a set of duties for a specified period, with the employee returned to his regular duties at the end of the detail.  Details are intended only for meeting temporary need of the agency's work program when necessary services cannot be obtained by other desirable or practical means.  Details may be made under circumstances such as the following:

a.  To meet emergencies occasioned by abnormal workload, special projects or studies, change in mission or organization, or unanticipated absences.
b.  Pending official assignment, pending description and classification of new position, pending security clearance, and for training purposes.

Section 4.  All noncompetitive details to higher graded positions will be limited to 120 calendar days within a twelve-month period.  A detail to a higher graded position for more than 120 calendar days must be made under competitive procedures.  Details to an equal or lower grade will only be accomplished as provided by appropriate regulations and this article.

Section 5.  It is agreed that no detail will be made to evade the principle of recruitment through open competitive examinations.  The employer assumes the responsibility for keeping details within the shortest practicable time limits and for a continuing effort to secure necessary services through use of appropriate personnel actions.  Details will not be used as a basis for reward or punishment.

Section 6.  All details of more than 30 days will be documented by the employee's immediate supervisor not later than the end of the detail and submitted to the Civilian Personnel Advisory Center.  The document reflecting the detail will be included in the employee's OPF.  All details less than 30 days will be documented by the employee's immediate supervisor not later than the end of the detail and a copy provided to the employee.

Section 7.  Selection for details shall be made on a fair and equitable basis.  Details shall not be made as a reward or punishment.

Section 8.  The parties agree that when an employee is detailed to any position in which the employee has had no previous experience the employee shall be given a reasonable break-in period with an experienced employee or necessary training.  The

USA-Alvarez-001798

parties further agree that a detail should be reasonably related to an employee's official position and qualifications.

Section 9.  Work will normally be assigned by the employee's first line supervisor.

## ARTICLE 40

## REASONABLE ACCOMMODATIONS

The employer is required to reasonably accommodate the needs of qualified employees with a known handicapping condition as required by applicable laws.  This means that the agency may be required to change or adjust the position or the workplace to enable the individual to perform the essential functions of the position.  It is the responsibility of the employee to identify the accommodation, however, the agency has the right to choose the specific accommodation it wishes to provide, as long as the accommodation enables the individual to perform the essential functions of the position.

## ARTICLE 41

## MOTOR VEHICLE OPERATORS

Section 1.  Motor vehicle operators will not knowingly be directed or required to take any actions in the performance of their duties, which violate any law, rule, regulation, or directive as set forth by the Department of Defense (DOD) and other applicable directives.

Section 2.  Motor vehicle operators will be trained and familiarized with cargo security requirements.

Section 3.  It is agreed that the employer will not hold the employee liable concerning destruction of government property except for just cause.  Disputes under this section are subject to the grievance procedure.

## ARTICLE 42

## UNION SPONSORED TRAINING

Section 1.  The union will be granted a total of 240 hours for each calendar year for purposes of union sponsored training.

Section 2.  A request for excused absence from duty will be submitted in writing by the union to the Director of the Civilian Personnel Advisory Center (CPAC) for each training session.  The request must be submitted 7 days in advance to allow adequate time for a considered decision.  Exceptions to this time limit will be considered on a case-by-case basis.  The request will contain:

    a. Copy of the agenda of the training session.

    b. Number of hours requested.

USA-Alvarez-001799



**EXHIBIT**

**F-33**

USA-Alvarez-001800

Home        Search Jobs        My Account        Resource Center          Welcome Gilberto | Sign out
                                                                                     USJX


WORKING FOR AMERICA

Keyword:                          Location:
Keywords, Job Title, Control #, Agency   City, State, Zip Co   Go to section of this Job:

# This Position Is No Longer Available

Overview   Duties   Qualifications & Evaluations   Benefits & Other Info   How to Apply

Print Preview

Agency Contact Info

Job Announcement Number:
NCMD148246431152700D

Control Number: 373770800

## U.S. Army Medical Command

**Job Title:** Supervisory Orthotist Prosthetist
**Department:** Department of the Army
**Agency:** U.S. Army Medical Command
**Job Announcement Number:** NCMD148246431152700D

### This position is closed and no longer accepting online applications through USAJOBS.

#### The contents of the announcement can still be viewed.

| | |
|---|---|
| **SALARY RANGE:** | $57,982.00 to $75,376.00 / Per Year |
| **OPEN PERIOD:** | Tuesday, July 1, 2014 to Monday, July 14, 2014 |
| **SERIES & GRADE:** | GS-0667-11 |
| **POSITION INFORMATION:** | Full Time - Permanent |
| **DUTY LOCATIONS:** | 1 vacancy in the following location: |
| | Fort Hood, TX   View Map |
| **WHO MAY APPLY:** | United States Citizens |
| **SECURITY CLEARANCE:** | Not Applicable |
| **SUPERVISORY STATUS:** | Yes |

**JOB SUMMARY:**
Civilian employees serve a vital role in supporting the Army mission. They provide the skills that are not readily available in the military, but crucial to support military operations. The Army integrates the talents and skills of its military and civilian members to form a Total Army.

**About the Position:**
This position is located at the Chief Department of Orthopedics & Rehabilitation, Orthopedic Clinic Services, Orthopedic Appliance Clinic, Fort Hood, TX.

Ft Hood is nicknamed The Great Place because of the quality of life the post and area offer Soldiers and their families. Ft Hood covers a total of 340 sq miles and rests in the beautiful 'hill and lake' country of Central Texas, between Killeen and Copperas Cove. For those who enjoy the outdoors, Ft Hood is the ideal location because of warm winters and hot summers. The nearby lakes, Belton and Stillhouse, offer year round outdoor recreation activities. Please visit: http://pao.hood.army.mil/

Who May Apply: U.S. Citizens

**TRAVEL REQUIRED**
- Not Required

**RELOCATION AUTHORIZED**
- No

**KEY REQUIREMENTS**
- A recruitment or relocation bonus may be authorized.

**DUTIES:**

As a Supervisory Orthotist Prosthetist at Ft. Hood, you will:

· Manage an Orthopedic appliance shop which provides professional, highly technical, and complex administrative support.
· Provide supervision to personnel designing, fabricating and fitting orthotic and prosthetic devices.
· Provide orthotic and prosthetic services to patients with a range of disabilities including serious, complicated and/or emergency nature.
· Operate all shop machines and hand tools required to perform fabrication, alteration and repair of orthotic and prosthetic appliances.
· Ensure acceptable quality standards are maintained within the work area and that appliances produced meet required specifications.

Back to top

## QUALIFICATIONS REQUIRED:

In order to qualify, you must meet the education and/or experience requirements described below. Your resume must clearly describe your relevant experience; if qualifying based on education, your transcripts will be required as part of your application. Additional information about transcripts is in this document.

• **Experience required:** To qualify based on your work experience, your resume must describe at least one year of experience which prepared you to do the work in this job. Specialized experience is defined as: reading and interpreting prescriptions for orthotic and prosthetic devices; operating shop machinery to perform fabrication of orthotic devices; appropriately measuring and fitting patients for a variety of orthotic devices; and providing administrative support for an orthopedic appliance shop. This definition of specialized experience is typical work performed at the next lower grade/level position in the federal service (GS-09).

Some federal jobs allow you to substitute your education for the required experience in order to qualify. For this job, you must meet the qualification requirement using experience alone--no substitution of education for experience is permitted.

You will be evaluated on the basis of your level of competency (knowledge, skills, abilities) in the following areas:

- Knowledge of Orthotic and Prosthetic Services
- Skill in Fabricating Orthotic and Prosthetic Devices
- Skill in Fitting Custom made Orthotic Devices
- Skill in Written and Oral Communication
- Ability to Provide Supervision

• Foreign education must be evaluated for U.S. equivalency in order to be considered for this position. You must include this information with your application package.
• Only degrees from an accredited college or university recognized by the Department of Education are acceptable to meet positive education requirements or to substitute for experience. For additional information, please go to the Office of Personnel Management (OPM) and U.S. Department of Education websites at http://www.opm.gov/qualifications and http://www.ed.gov/admins/finaid/accred/index.html

**Other Requirements:** Click here for expanded definitions.

- Male applicants born after December 31, 1959 must complete a Pre-Employment Certification Statement for Selective Service Registration.
- You will be required to provide proof of U.S. Citizenship.
- One year trial/probationary period may be required.
- One-year supervisory probationary period required. A one-year probationary period is required if the selectee has not previously met this requirement.
- Direct Deposit of Pay is Required.
- Personnel Security Investigation required.
- This position requires a Childcare Background Check (CNACI).
- This position is subject to annual seasonal influenza vaccinations. Applicants tentatively selected for appointment to this position will be required to sign a statement (Condition of Employment) consenting to seasonal influenza vaccinations or must provide a recognized exemption.
- A pre-placement medical examination is required.

Dock

Go to section of this Job:

Print Preview

Agency Contact Info

**Job Announcement Number:** NCMD148246431152700D

**Control Number:** 373770800

- Immunization screening is required. Hepatitis B immunization is required for all positions with direct patient contact. Applicants may be required to show proof of other immunizations depending on the type of position.
- All Health Care Providers must be able to obtain and maintain current Basic Life Support (BLS) Training and certification that is sponsored or endorsed by the American Heart Association (AHA). Current Advanced Life Support or other advanced certification does not supersede BLS completion.

HOW YOU WILL BE EVALUATED:

Your application package (resume, supporting documents, and responses to the questionnaire) will be used to determine your eligibility, qualifications, and quality ranking for this position. Please follow all instructions carefully. Errors or omissions may affect your rating or consideration for employment.

**Basis for Rating:** Qualified candidates will be assigned to one of three quality categories: Best Qualified, Highly Qualified and Qualified. Veteran preference eligibles are listed ahead of non-preference eligibles within each quality category.

- Best Qualified. Candidates in this category possess exceptional skills and experience to exceed well above the minimum requirements for the announced position.
- Highly Qualified. Candidates in this category possess good skills and experience above the minimum requirements for the announced position.
- Qualified. Candidates in this category meet the minimum experience requirements for the announced position.

**Interagency Career Transition Assistance Program (ICTAP).** If you are a Federal employee in the competitive service and your agency has notified you in writing that you are a displaced employee eligible for ICTAP consideration, you may receive selection priority. See Interagency Career Transition Assistance Program (ICTAP) for more information. Additional information about the program is on OPM's Career Transition Resources website.

BENEFITS:                                                                                        Back to top
**The Department of Defense offers an excellent benefits program.** In addition to your take-home pay, your comprehensive compensation/benefits package will include most of the benefits described in the USAJOBS Resource Center.

OTHER INFORMATION:
- Selection is subject to restrictions resulting from Department of Defense referral system for displaced employees.
- If you have retired from federal service and you are interested in employment as a reemployed annuitant, see the information in the Reemployed Annuitant information sheet.
- You may claim military spouse preference, see the information in the Military Spouse Preference Under Delegated Examining Procedures information sheet.
- Multiple positions may be filled from this announcement.
- Salary includes applicable locality pay or Local Market Supplement.
- Credit will be given for appropriate unpaid work experience.
- This is a Career Program (CP) 53 position.

HOW TO APPLY:                                                                                    Back to top
To apply for this position, you must complete the online questionnaire and submit the documentation specified in the **Required Documents** section below.

The complete application package must be submitted by 11:59 PM (EST) on Monday, July 14, 2014 to receive consideration.

- To begin, click Apply Online to create a USAJOBS account or log in to your existing account. Follow the prompts to select your USAJOBS resume and/or other supporting documents and complete the occupational questionnaire.
- Click the Submit My Answers button to submit your application package.
- It is your responsibility to ensure your responses and appropriate documentation is submitted prior to the closing date.
- To verify your application is complete, log into your USAJOBS account, select the Application Status link and then select the more information link for this position. The Details page will display the status of your application, the documentation received and processed, and any correspondence the agency has sent related to this application. Your uploaded documents may take several hours to clear the virus scan process.

Onck

Go to section of this Job:

Print Preview

Agency Contact Info

**Job Announcement Number:**
NCMD148246431152700D

**Control Number:** 373770800

- To return to an incomplete application, log into your USAJOBS account and click Update Application in the vacancy announcement. **You must re-select your resume and/or other documents from your USAJOBS account or your application will be incomplete.**
- It is your responsibility to verify that information entered, uploaded, or faxed (i.e., resume) is complete, accurate, and submitted by the closing date. Uploaded documents may take up to one hour to clear the virus scan. Faxed documents must be completely transmitted by 11:59p.m. Eastern Standard Time on the closing date of the announcement.

The Department of the Army provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please notify the servicing civilian personnel unit. Your requests for reasonable accommodation will be addressed on a case-by-case basis.

Quick

Go to section of this Job:

Print Preview

Agency Contact Info

Job Announcement Number:
NCMD14B246431152700D

Control Number: 373770800

**REQUIRED DOCUMENTS:**
The documents you are required to submit vary based on whether or not you are eligible for preference in federal employment. A complete description of preference categories and the associated required documents is in the Applicant Checklist (External).

As described above, your complete application includes your resume, your responses to the online questionnaire, and documents which prove your eligibility to apply. **If you fail to provide these documents, you will be marked as having an incomplete application package and you will not be considered any further.**

**Your resume:**

- Your resume may be submitted in any format.
- If you submit more than one copy of your resume, only the most recent version will be reviewed. The latest timestamp will be used to determine which version of your resume is "most recent." It is your responsibility to check the status and timestamp of all documents you submit as part of your application.
- If your resume includes a photograph or other inappropriate material or content, it will not be used to make eligibility and qualification determinations and you may not be considered for these positions.
- For qualifications determinations your resume must contain hours worked per week and the dates of employment (i.e., HRS per week and month/year to month/year or month/year to present). If your resume does not contain this information, your application will be marked as incomplete and you will not receive consideration for this position.

**If you are relying on your education to meet qualification requirements:** You MUST submit a copy of your transcript if you want to substitute your education for experience. If you claim qualifications based on education, and do not submit a transcript, your education will not be used in making a qualification determination and you may be found "not qualified." See: Transcripts and Licenses

**License/Certification:** If the position has a license/certification requirement, you MUST submit a copy of your current, active, valid, unrestricted license/certification.

If you are unable to apply online or unable to upload your supporting documents follow the directions located at: Faxing Applications and Documents The Vacancy ID is 1152700. You will need the questionnaire, View Occupational Questionnaire, to complete your faxed application

**NOTE:** Documents submitted as part of the application package, to include supplemental documents, may be shared beyond the Human Resources Office. Some supplemental documents such as military orders and marriage certificates may contain personal information for someone other than you. You may sanitize these documents to remove another person's personal information before you submit your application. You may be asked to provide an un-sanitized version of the documents if you are selected to confirm your eligibility.

**AGENCY CONTACT INFO:**
Central Resume Processing Center
Phone: (410)306-0137
Email: USARMY.APG.CHRA-
NE.MBX.APPLICANTHELP@MAIL.MIL

Agency Information:
MEDCOM Medcell Recruitment
Directorate
Aberdeen Proving Ground, MD
21005

**WHAT TO EXPECT NEXT:**
If you provided an email address, you will receive an email message acknowledging receipt of
your application. Your application package will be used to determine your eligibility, qualifications, and
quality ranking for this position.

If you are determined to be ineligible or not qualified, your application will receive no further
consideration.

The documents you submit must support your responses to the online questionnaire. If your
application contradicts or does not support your questionnaire responses, you will receive a rating of "not
qualified" or "Incomplete application" and you will not receive further consideration for this job.

Back to top

Back

Go to section of this Job:

Print Preview

**Agency Contact Info**

**Job Announcement Number:**
NCMD148246431152700D

**Control Number:** 373770800

EEO Policy Statement    | Reasonable Accommodation Policy Statement    | Veterans Information    | Legal and Regulatory Guidance
Site Map    Contact Us    Help/FAQs    Privacy Act and Public Burden Information    FOIA    About Us    USA.gov
This is a United States Office of Personnel Management website.
USAJOBS is the Federal Government's official one-stop source for federal jobs and employment information.

**EXHIBIT**

**F-34**

USA-Alvarez-001806

**Attached are additional documents provided by the complainant, Mr. Gilberto Alvarez on 19 Sep 14.**

USA-Alvarez-001807

**CORNWELL, Kathryn D (Kathy) CIV USARMY IMCOM CENTRAL (US)**

| | |
|---|---|
| **From:** | Gilbert Alvarez [mr.gil303@gmail.com] |
| **Sent:** | Thursday, September 18, 2014 7:36 PM |
| **To:** | Antosh, Ivan J MAJ USARMY (US) |
| **Subject:** | Re: Inquiry? (UNCLASSIFIED) |

Maj. Antosh,

I have two questions to your response. First, who is we?, your job announcement clearly stated under requirements that the selection would be solely based on experience and experience alone.

Gilbert Alvarez
Orthotist
Ortho Brace Clinic
Orthopedic Service
C.R. Darnall Army Medical Center
Ft. Hood, Texas 76544

On Wed, Sep 10, 2014 at 7:50 AM, Antosh, Ivan J MAJ USARMY (US)
<ivan.j.antosh.mil@mail.mil> wrote:

> Classification: UNCLASSIFIED
> Caveats: NONE
>
> Mr. Alvarez-
>
> We interviewed the candidate with the most experience and orthotics education/credentials.  All of the applications, including yours, were reviewed in depth.  We felt that this individual was more qualified for this position.  We are currently pending finalization of that process.  More to follow when we know more.
>
> Dr. A
>
> -----Original Message-----
> From: Gilbert Alvarez [mailto:mr.gil303@gmail.com]
> Sent: Tuesday, September 09, 2014 10:25 PM
> To: Antosh, Ivan J MAJ USARMY (US)
> Subject: Inquiry?
>
> Maj. Antosh,

USA-Alvarez-001808

I was reviewing the most recent Dept.Chiefs meeting presentation and discovered a candidate for the Brace Shop supervisory position had been interviewed, and an offer was made and accepted.

On the July, 17 2014, I received notification that my application was reviewed, approved as a qualified candidate and forwarded for consideration. I have not received any further updates.

In lieu of my recent discovery, I would like to know why I was not considered for an interview?

Gilbert Alvarez
Orthotist
Ortho Brace Clinic
Orthopedic Service
C.R. Darnall Army Medical Center
Ft. Hood, Texas 76544
(254) 287-7717 <tel:%28254%29%20287-7717>   <tel:%28254%29%20287-7717>

Classification: UNCLASSIFIED
Caveats: NONE

USA-Alvarez-001809

**CORNWELL, Kathryn D (Kathy) CIV USARMY IMCOM CENTRAL (US)**

| | |
|---|---|
| **From:** | Gilbert Alvarez [mr.gil303@gmail.com] |
| **Sent:** | Thursday, September 18, 2014 7:46 PM |
| **To:** | CORNWELL, Kathryn D (Kathy) CIV USARMY IMCOM CENTRAL (US) |
| **Subject:** | Fwd: FW: incident (UNCLASSIFIED) |

---------- Forwarded message ----------
From: Alvarez, Gilberto M CIV USARMY MEDCOM (US)
<gilberto.m.alvarez.civ@mail.mil>
Date: Fri, Aug 8, 2014 at 5:56 PM
Subject: FW: incident (UNCLASSIFIED)
To: "Bowling, Donna M CIV (US)" <donna.m.bowling6.civ@mail.mil>,
"Mr.Gil303@gmail.com" <Mr.Gil303@gmail.com>


Classification: UNCLASSIFIED
Caveats: NONE



-----Original Message-----
From: Alvarez, Gilberto M CIV USARMY MEDCOM (US)
Sent: Friday, August 08, 2014 5:55 PM
To: Antosh, Ivan J MAJ USARMY (US)
Cc: Perez, Matthew S CIV (US)
Subject: incident (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Maj. Antosh, I have let many things go, however what occurred this morning you
must be made aware of, I walked into the back office to look for a form and woke
up Mr. Perez. He was sleeping. I said you were sleeping. He said I have nothing
to do, something to that effect. I left the room and Mr. Perez closed the door
and turned off the light. Mr. Perez quiet frequently goes into that office with
the door closed, lights off and blinds shut. (I am not referring to the times
when I am making too much noise that he can't hear when talking on the phone or
wants privacy while on the phone). I just have to say this he spent around 90 %
of his day watching TV, talking on the phone, leaning back in his chair hands
behind his head watching me work, put supplies away, matching supplies for pts.
that have been waiting for fitting and making a collar for his dog. Can I also
get this work arrangement? It is now 1730 and still here trying to get my pts.
the orthoses that require special orders. I will have to finish todays encounters
Monday. I will take my time sheet over when I leave for the day. SFC Wood is
usually their way past this time. This type of work environment should be
addressed. If not I at least made you aware. I am getting sick to my stomach, I
have to stop now. Have a good weekend. Signed Frustrated

1

USA-Alvarez-001810

Gilbert Alvarez
Orthotist
Ortho Brace Clinic
Orthopedic Service
C.R. Darnall Army Medical Center
Ft. Hood, Texas 76544
(254) 287-7717 <tel:%28254%29%20287-7717>

"Compassionate, World-Class Healthcare - One Patient at a Time"

HIPAA Disclaimer text




Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE

USA-Alvarez-001811

**CORNWELL, Kathryn D (Kathy) CIV USARMY IMCOM CENTRAL (US)**

| | |
|---|---|
| **From:** | Gilbert Alvarez [mr.gil303@gmail.com] |
| **Sent:** | Thursday, September 18, 2014 7:44 PM |
| **To:** | CORNWELL, Kathryn D (Kathy) CIV USARMY IMCOM CENTRAL (US) |
| **Subject:** | Fwd: FW: Sleeping (UNCLASSIFIED) |

---------- Forwarded message ----------
From: Alvarez, Gilberto M CIV USARMY MEDCOM (US)
<gilberto.m.alvarez.civ@mail.mil>
Date: Wed, Aug 20, 2014 at 4:30 PM
Subject: FW: Sleeping (UNCLASSIFIED)
To: "Mr.Gil303@gmail.com" <Mr.Gil303@gmail.com>

Classification: UNCLASSIFIED
Caveats: NONE

-----Original Message-----
From: Alvarez, Gilberto M CIV USARMY MEDCOM (US)
Sent: Wednesday, August 20, 2014 4:29 PM
To: Perez, Matthew S CIV (US); Antosh, Ivan J MAJ USARMY (US)
Cc: Bowling, Donna M CIV (US)
Subject: Sleeping (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Perez, I am asking for you to find somewhere else to sleep than my exam
room/office. Monday morning when I walked in my room and saw you laying there
asleep I was in shock, as well as startled. The same thing happened to Mrs.
Bowling when you walked out of the exam room next to her desk last week. Please
stay out of my exam room.

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

i

USA-Alvarez-001812



**EXHIBIT**

# F-35

USA-Alvarez-001813

# INVESTIGATOR'S DECLARATION

I**, Lynn C. Smith**, EEO Complaints Investigator, Investigations and Resolutions Directorate of Defense Civilian Personnel Advisory Services, assigned to investigate the complaint of Gilberto Alvarez, ARHOOD14MAY01732, in accordance with 28 U.S.C. Section 1746, declare the following:

Prior to the beginning of the investigation, I spoke to the parties telephonically to facilitate a resolution. I briefly spoke to Gilberto Alvarez –Complainant and Thaddeus Podbielski, and asked them to start considering possible resolutions that might benefit both sides. I explained to them the benefits to settling an EEO matter early in the process and eliminate the need to involve other witnesses or management officials. I also explained how both sides needed to be flexible and that in order for a resolution of the complaint to be effective, they needed to keep in mind negotiations require a give and take on both sides. I also informed each side that there is no admission of guilt on either side. I explained there would be no discussion regarding the merits of the case, but I would entertain questions regarding the process of the investigation. I further explained that I would only facilitate the discussions of resolution. Neither side could agree on a resolve. I indicated to the parties that during the onsite visit they would be given another opportunity during the Pre-Fact Finding Conference to explore other possibilities to resolve, prior to the FFC.

A Fact Finding Conference (FFC) was conducted on October 22, 2014. Prior to the FFC, a Pre-FFC was held. Those in attendance were Complainant, Lee Anne Alvarez – Complainant's Representative and spouse, Thaddeus Podbielski and CPT Mary Jones, Labor Counselors for the Department of the Army. The discussion lasted about an hour and 15 minutes, due to the agency counsel contacting and obtaining permission to go ahead with what was being offered and agreed upon by both the agency and Complainant (IF 257).

After the FFC started and testimony began, the agency decided to take all offers of a possible settlement off the table, due to what they believed was more in their best interest.

It is noteworthy to point out that a few days prior to the FFC, Complainant dismissed his original representative, Samuel Boles, and added his wife as his representative.

## END OF STATEMENT

I, Lynn C. Smith**,** declare under penalty of perjury, that the foregoing is true and correct.

Date: _December 21, 2014_          Signature: _Lynn C. Smith_

USA-Alvarez-001814

*EXHIBIT*

*G*

USA-Alvarez-001815



**DEPARTMENT OF DEFENSE**
CIVILIAN PERSONNEL MANAGEMENT SERVICE
INVESTIGATIONS AND RESOLUTIONS DIVISION

September 29, 2014

MEMORANDUM FOR   Rex Thomas, Equal Employment Opportunity Manager
III CORPS & Fort Hood EEO Office
1001 761st Tank Battalion Ave Room W209
Fort Hood TX, 76544
Phone: 254-287-3046

SUBJECT:   Complaint of Gilberto Alvarez
Agency Number: ARHOOD14MAY01732

**SUSPENSE DATE: October 21, 2014**

I have been assigned to investigate subject complaint. The investigation will be conducted using fact-finding conference (FFC) procedures. A pre-conference will be held at **8:30 a.m. on October 22, 2014,** III CORPS & Fort Hood EEO Office 1001 761st Tank Battalion Ave Room W209, Fort Hood TX, 76544, Phone: 254-287-3046, for the entire day, followed immediately by the formal FFC. I will either be onsite or conduct the conference telephonically. A certified court reporter will be required. The transcript of the verbatim testimony **must be received by IRD within 14 calendar days of the close of the FFC**. Please e-mail it to the attention of this investigator.

The claim(s) under investigation are:

Was Complainant subjected to a hostile work environment on the basis of his national origin (Hispanic) when:

a.   On April 14, 2014, he received an email from MAJ Ivan Antosh, Acting Chief, Orthopedic Brace Shop, that a provider from California had been selected for the position of Supervisory Orthotics Prosthetic, GS-0667-11;

b.   On March 7, 2014, he was intentionally misled by Mr. Valentin Cruz, Supervisory Health Systems Specialist, concerning the announcement of the position of Supervisory Orthotics Prosthesis, GS-0667-11. Mr. Cruz allegedly said he was working on the position description for the announcement when it had already been announced and closed on March 6, 2014; the hostile work environment continued from 2007 to present when:

Additional examples he provided of the adverse atmosphere which created a continuing hostile work environment from 2007 until present are:

255

a.   On June 17, 2013, Ms. Amarilis Diaz-Rosario De Santiago, secretary to COL Gregory Weaver, Chief, Department of Orthopedic and Rehabilitative Services, sent an email to the entire division stating MAJ Antosh would be the Acting Chief, Orthopedic Brace Shop.

b.   On May 31, 2013, the complainant sent COL Weaver an email questioning why Mr. James Spell, previous Chief, Orthopedic Brace Shop, was making policy when for all intents and purposes, he was no longer working.

c.   On May 29, 2013, after Mr. Spell found out the complainant had been named Acting Chief, Orthopedic Brace Shop, he allegedly, placed a typewritten note – no heading, no signature – dated May 29, 2013, on the complainant's desk, subject:  Temporary operation policy and guidance for the Orthopedic Brace Clinic, placing the complainant and a co-worker, Mr. Matthew Perez, Orthotist, GS-0667-7, on equal duties in the Orthopedic Brace Shop; and,

d. Although Mr. James Spell's effective retirement date was August 31, 2013, he was out of the office most of the time from May 2013 until he retired.  On May 24, 2013, COL Weaver sent an email stating the complainant would be the Acting Chief, Orthopedic Brace Shop effective June 3, 2013, until further notice; and

e.   The complainant alleges Mr. Spell intentionally slandered and defamed you to your chain of command so they would not consider him for the supervisory position because of his hatred for Hispanics.  Mr. Spell allegedly told the complainant several times since he came to Fort Hood in 2007, that he hated him and wished he had never come to work here.  Mr. Spell allegedly hated that he had no part in his employment at Fort Hood because he was a Priority Placement Program employee after his position at Fort Sill was abolished.

f.   Mr. Perez began documenting the complainant's time and was removed from provider status, thus doubling the complainant's patient load after he initiated contact with the Fort Hood EEO Office on May 15, 2014.

g.   On September 11, 2014, the complainant amended his complaint by adding non-selection based on national origin (Hispanic) and reprisal when he discovered, on/or about September 8, 2014, he had not been selected for the position, Supervisory Orthotist Prosthetist, GS-0667-11, after it was re-announced on July 1, 2014.

In accordance with 29 CFR 1614.108, I am authorized to administer oaths and to investigate all aspects of this discrimination complaint.  I am authorized to require all employees of the agency to cooperate in the conduct of the investigation, and to require any agency employee having any knowledge of the matter(s) at issue to furnish testimony under oath or affirmation or to submit a declaration under penalty of perjury without a pledge of confidentiality.

A list of witnesses for the FFC and the times of their expected participation are included at **Attachment 1**.  If any of these individuals are not available at the appointed time, please notify me at once so that other arrangements can be made.  Please note that you are responsible for advising the Complainant, witnesses and all other personnel involved in this case (including representatives) my appointment as the investigator; the date, time and place of the scheduled

USA-Alvarez-001817

FFC; and his or her role in it (a copy of this memorandum may be used toward those purposes). Although the Complainant, Complainant's Representative (if any), and the Agency Representative are being sent a copy of this memorandum with attachments, you are encouraged to confirm each individual's receipt of this set of documents as this will help assure notification to all parties in the event copies are misdirected or lost.

A specific explanation of FFC procedures is contained in **Attachment 3**, "A Participant's Guide to Fact-Finding Conferences in Complaint Investigations." This guide is to be used as the basis for informing all participants of their role in the FFC process. All parties designated must be available on the date the FFC is scheduled unless good cause is shown; i.e., illness or extreme emergency. Those failing to appear without good cause will be considered to have failed to cooperate in an official investigation.

**By October 21, 2014,** please re-affirm me of the building and room where the FFC will be held. The room should provide a professional setting. If any participant has a disability, the room must be accessible. Furthermore, a local contact person must be identified to provide administrative support for this investigation. Please provide the name and phone number of that person **by October 21, 2014**. Anticipated support includes such things as obtaining court reporting services, making arrangements for the room where the FFC will be held, and communicating with witnesses to report changes in the interview schedule that may be made during the FFC. Please advise the person assigned to provide support of the sensitive nature of this investigation and that all information related thereto is confidential and not to be discussed or shared with any individual unless instructed to do so by me.

Thank you for your assistance. Questions may be directed to me at (703) 350-9283 or (703) 795-7721, and my email address is lynn.smith@cpms.osd.mil.

*Lynn C. Smith*
Lynn C. Smith
Investigator

3 Attachments (as stated)
cc (by email with attachments):
Gilberto Alvarez - Complainant
Samuel Boles – Complainant's Representative
Thaddeus A. Podbielski – Agency Representative

USA-Alvarez-001818

-4-

Attachment 1

## FACT-FINDING CONFERENCE SCHEDULE

Discrimination Complaint of Gilberto M. Alvarez

Agency Number ARHOOD14MAY01732

**October 22, 2014**

|  |  |
|---|---|
| 8:30 a.m. | Pre-conference |
|  | Participants: |
|  | Gilberto M. Alvarez, Complainant |
|  | Samuel Boles – Complainant's Representative |
|  | Thaddeus A. Podbielski – Agency Representative Agency Official with authority to resolve the complaint |
|  | Human Resources Technical Advisor, if desired |
|  | NOTE:  The presence of the Agency Official with authority to resolve and the Human Resources Technical Advisor, if any, is the responsibility of the Agency Representative. |
| 9:00 a.m. | Gilberto Alvarez - Complainant |
| 10:30 a.m.* | MAJ Ivan Antosh ** |
| 11:45 p.m.* | Mr. Valentin Cruz ** |
| 12:50pm | Lunch |
| 1:30pm.* | Gregory Weaver |
| 2:30pm | James Spell - Retired |
| 3:50pm* | Closing statements |

\*  Approximate time they will be needed.  Witnesses should be flexible and available throughout the day.  This list is tentative, and additional witnesses may be necessary.

\*\*The investigator has determined that you should be present during complainant's testimony.

USA-Alvarez-001819

Attachment 2

# STATEMENT OF CLAIMS

Discrimination Complaint of Alvarez Gilberto

Agency Number ARHOOD14MAY01732

Was Complainant subjected to a hostile work environment on the basis of his national origin (Hispanic) when:

a. On April 14, 2014, he received an email from MAJ Ivan Antosh, Acting Chief, Orthopedic Brace Shop, that a provider from California had been selected for the position of Supervisory Orthotist Prosthetic, GS-0667-11;

b. On March 7, 2014, he was intentionally misled by Mr. Valentin Cruz, Supervisory Health Systems Specialist, concerning the announcement of the position of Supervisory Orthotist Prosthetist, GS-0667-11. Mr. Cruz allegedly said he was working on the position description for the announcement when it had already been announced and closed on March 6, 2014; the hostile work environment continued from 2007 to present when:

Additional examples the complainant provided of the adverse atmosphere which created a continuing hostile work environment from 2007 until present are:

a. On June 17, 2013, Ms. Amarilis Diaz-Rosario De Santiago, secretary to COL Gregory Weaver, Chief, Department of Orthopedic and Rehabilitative Services, sent an email to the entire division stating MAJ Antosh would be the Acting Chief, Orthopedic Brace Shop.

b. On May 31, 2013, the complainant sent COL Weaver an email questioning why Mr. James Spell, previous Chief, Orthopedic Brace Shop, was making policy when for all intents and purposes, he was no longer working.

c. On May 29, 2013, after Mr. Spell found out the complainant had been named Acting Chief, Orthopedic Brace Shop, he allegedly, placed a typewritten note – no heading, no signature – dated May 29, 2013, on his desk, subject: Temporary

USA-Alvarez-001820

operation policy and guidance for the Orthopedic Brace Clinic, placing the complainant and a co-worker, Mr. Matthew Perez, Orthotist, GS-0667-7, on equal duties in the Orthopedic Brace Shop; and.

d.   Although Mr. James Spell's effective retirement date was August 31, 2013, he was out of the office most of the time from May 2013 until he retired.  On May 24, 2013, COL Weaver sent an email stating the complainant would be the Acting Chief, Orthopedic Brace Shop effective June 3, 2013, until further notice; and

e.   The complainant alleges Mr. Spell intentionally slandered and defamed him to his chain of command so they would not consider him for the supervisory position because of his hatred for Hispanics.  Mr. Spell allegedly told the complainant several times since he came to Fort Hood in 2007, that he hated him and wished he had never come to work here.  Mr. Spell allegedly hated that he had no part in his employment at Fort Hood because he was a Priority Placement Program employee after his position at Fort Sill was abolished.

Was Complainant discriminated against based on national origin (Hispanic) and reprisal for having filed this complaint when:

    a. Mr. Perez began documenting his time and was removed from provider status, thus doubling the complainant's patient load after he initiated contact with the Fort Hood EEO Office on May 15, 2014.

    b. On September 11, 2014, the complainant amended his complaint by adding non-selection based on national origin (Hispanic) and reprisal when he discovered, on/or about September 8, 2014, he had not been selected for the position, Supervisory Orthotist Prosthetist, GS-0667-11, after it was re-announced on July 1, 2014.

USA-Alvarez-001821

# A PARTICIPANT'S GUIDE

# TO FACT-FINDING CONFERENCES

# IN COMPLAINT INVESTIGATIONS

**Department of Defense**
**Civilian Personnel Management Service**
**Investigations and Resolutions Division**
Attachment 3

USA-Alvarez-001822

# INTRODUCTION

The Investigations and Resolutions Division (IRD) of the Defense Civilian Personnel Management Service is authorized to investigate individual, formal complaints of discrimination filed by DoD civilian employees or applicants.  IRD's authority includes reviewing and copying pertinent records, requiring DoD personnel to testify under oath or affirmation without a pledge of confidentiality, and issuing reports of investigation.

The fact-finding conference (FFC) is an administrative procedure designed to facilitate the collection of facts in an investigation and is one of several methods available to the investigator.  It is an administrative and not a judicial proceeding, and does not replace any hearing which may be conducted by the Equal Employment Opportunity Commission (EEOC).  In an FFC, the investigator takes sworn testimony that is recorded verbatim by a court reporter.  This guide explains how the FFC works and how you can expect to participate.

## WHO PARTICIPATES?

**Investigator.**  The investigator is an IRD employee who conducts and controls the FFC.  The investigator decides who will testify, which documents will be included in the investigative file, what questions will be asked, and whether the testimony being provided is germane to the accepted claims.  The investigator will ask the questions during the FFC, but he or she may also invite questions from the participating parties.

Investigators conduct an impartial fact-finding inquiry, prepare a case record, and write a report of investigation.  They are responsible for developing material evidence for the record regardless of whose position the evidence may support.

The investigator is not an employee of the agency under investigation, but is a neutral third party.  In an FFC, the investigator's objective is to develop a record on which a decision can be made; however, the investigator does not make a decision on the merits of the case.

**Complainant.**  This is the individual who filed the complaint.  He or she should be present throughout the FFC and is entitled to testify about the complaint, nominate witnesses, submit relevant documents for consideration by the investigator, and have a personal representative to assist him or her in presenting the complaint.

**Primary Management Witness(es).**  This is typically the individual(s) who made the decision(s), took the action(s), or should have known about the action(s) giving rise to the complaint.  Complainants are not required to identify a management witness responsible for the contested action.  Complaints are filed against the agency, not against individuals, and no management witness is a party to the complaint.

USA-Alvarez-001823

A primary management witness, however, is generally called to testify about the complaint. To the extent necessary for a reasonably thorough review of the circumstances under which the alleged discrimination occurred, the investigator will ensure that the primary management witness is briefed about and allowed to respond to testimony containing allegations of wrongdoing, allowed to review the documents containing allegations involving him or her, and given the opportunity to nominate witnesses and submit documents. The primary management witness may also have a personal representative to assist him or her in responding to the complaint. The primary management witness will typically be present to hear the complainant's testimony, but will be excused when other witnesses testify.

**Agency Representative.** The agency representative (usually an agency labor counselor) is the official designated to represent the agency during the FFC to ensure that the agency's position is sound and supported by competent evidence. The agency representative may participate in all phases of the FFC. The agency representative does not act as a personal representative for any agency witness because complaints are filed against agencies rather than individual employees.

**Personal Representatives.** The complainant, as well as all witnesses, may select a person to assist in the presentation of and/or response to the complaint, but this individual does not testify. This individual may be a legal or personal advisor. There is no requirement to have a personal representative. Agency Equal Employment Opportunity (EEO) personnel may not serve as personal representatives and IRD does not designate, nor can they recommend, personal representatives. The roles of personal representative and witness are not generally compatible.

**Witnesses.** These are individuals who are called to testify about their knowledge of the claim(s) in the complaint. The investigator determines who will testify. The investigator may call witnesses that have not been nominated by the complainant, the primary management witness, or the agency representative. Conversely, the investigator may decide not to call one or more witnesses nominated by a participant. The investigator will attempt to avoid unduly repetitious testimony. Therefore, it is in the best interest of all participants that they only nominate witnesses with the most relevant and direct knowledge of the claim(s), i.e., those with first-hand or eyewitness information.

The investigator will request that witnesses be notified in advance (by activity personnel) that they are expected to testify during the investigation. Advance notice includes briefing the witnesses as to the claim(s) accepted for investigation, informing them that they will be asked to testify under oath or affirmation without a pledge of confidentiality and in the presence of other individuals, and advising them of their right to testify without reprisal for participating in the investigation.

**Agency EEO Official.** The EEO official is usually an agency employee who accepts the complaint and forwards it to IRD for investigation. Arrangements for the FFC are made through the EEO official or his/her designated point of contact. IRD relies on the EEO official to arrange for a court reporter to produce a transcript of the FFC for IRD's use, notify all participants of the upcoming investigation, and acquire appropriate

USA-Alvarez-001824

facilities for conducting the FFC.  The EEO official is available to assist in settling disputes, if any, about the claims accepted for investigation.  Typically, the EEO official and agency representative coordinate any settlement agreement that may be reached during an FFC.

**Resource Person (Optional).**  Sometimes other personnel are designated to assist in the FFC because of their knowledge of EEO, agency policies or directives, and/or human resources management.  These individuals (usually EEO officials or agency human resources specialists) may be called upon to locate documents, regulations, witnesses, etc., during the pre-conference meeting and the FFC.

**Technical Advisor (Optional).**  IRD guidelines permit both parties to have a technical advisor or advisors as needed at the FFC.  Depending on the claims being reviewed, this could be a human resources specialist, a finance specialist, or another functional specialist.  The role of technical advisors is limited to advising the parties on technical issues.  They may not actively participate in the FFC.  Technical advisors may be excluded if the opposing party raises a persuasive objection or if their presence inhibits witnesses or is otherwise disruptive to the FFC process.

## WHAT HAPPENS?

When it appears that an FFC is the preferred method of investigation, the investigator will notify the EEO official of his or her intent to use an FFC to investigate the complaint.

Each party is responsible for preparing fully before the investigation and this includes being ready to provide specifics about the matters in dispute.  For example:

- Find out the first and last names of individuals who witnessed the contested events.
- If you cannot recall dates and times, try to narrow it down as closely as possible.
- Be ready to explain the position you take on the question of discrimination.
    - Were people in the same situation treated differently than you? What are their names?  How were they treated differently?
    - Do you have evidence to support your position?
    - Do you know what specific individuals were involved in bringing about this treatment, and
    - When did the events occur?

Remember that the investigator is seeking facts, not opinions or supportive testimony from friends or individuals who simply feel the same way you do.

Usually the investigator will set a deadline for the submission of witnesses' names and documents.  It is in the participants' best interests to comply with this deadline.  Do

USA-Alvarez-001825

not withhold witnesses or documents for presentation during the FFC. When nominating witnesses, identify what testimony you expect each one to provide. Without this information, the investigator may not be able to determine whether the witness is required.

Prior to the FFC, the investigator will meet with the complainant, his or her representative (if any), the agency representative, and the resource person (if any) to go over the procedures of the FFC, the claims accepted for investigation, the burdens of proof in a discrimination complaint, the witness list, and parts or all of the investigative file (as determined by the investigator to be necessary and appropriate). If you have any questions about the procedures, the investigator's reasons for calling or not calling certain witnesses or for accepting or excluding certain documents, ask those questions at this meeting. The investigator may also ask about efforts to resolve the complaint and, with the agreement of the parties, may serve as a facilitator to resolve the complaint.

Prior to testifying, participants will be asked to read the Privacy Act notice that explains the purpose of the investigation and IRD's authority to collect testimony during the investigation.

During the FFC, the investigator will open the record, ask questions of each witness, and close the record. The investigator may go off the record at any time to clarify procedures, allow for breaks, solicit questions from the parties, obtain documents, call witnesses, etc. The investigator will summarize discussion(s) or decision(s) made off the record when he or she reopens the record. Remember, this is an administrative inquiry; courtroom rules and procedures do not apply. The record is developed primarily through questions asked by the investigator. The investigator may allow either side to ask questions of witnesses to augment the record, as long as the questions are relevant and the parties are cordial and respectful of each other.

At the investigator's discretion, the parties may make opening and/or closing statements during the FFC. These are opportunities to comment on the evidence; they are not the time to present new evidence or testimony.

If necessary, the investigator will arrange to collect the testimony, usually by declaration under penalty of perjury, of any witness not available for the FFC.

The EEO official will arrange for the court reporter to send a copy of the transcript directly to IRD within 14 calendar days of the FFC. Copies of the report of investigation and the investigative file, including the transcript, will be distributed by the agency to the appropriate officials as prescribed by the agency.

USA-Alvarez-001826

## Request for Investigation Form

ARHOOD14MAY01732

Agency Docket Number

MEDCOM, CRDAMC, Orthopedic & Rehabilitation Svcs, Fort Hood, TX

Activity Against

Investigation Location if different than Activity Against

Card Holder Name/Phone/Email address

26 Jun 14

Date Formal Complaint Filed

MEDCOM, CRDAMC, Orthopedic Brace Shop, Fort Hood, TX

Complainant's Activity

Date IMPAC Payment Posted and Confirmation Number

### Complainant's Information

Gilberto M. Alvarez

Complainant's Name

254-287-7717          580-647-7786

Work Phone          Alternate Phone

4901 Rose Quartz Dr.

Address (Home/Work – whichever is preferable to receive correspondence)

Killeen, TX  76542

City, State, ZIP Code

gilberto.m.alvarez.civ@mail.mil

Email Address

Samuel T. Boles

Complainant's Representative

254-287-8821

Work Phone          Alternate Phone

4631 Engineer Dr.

Address

Fort Hood, TX  76544

City, State,  ZIP Code

samuel.t.boles.civ@mail.mil

Email Address

### Agency Representative Information

Thaddeus A. Podbielski

Agency Representative

254-287-6161

Work Phone          Fax

1001 761st Tank Battalion Ave.

Address

Fort Hood, TX  76544

City, State, ZIP Code

thaddeus.a.podbielski.civ@mail.mil

Email Address

Non-consideration/harassment (NS)

Basis/Issue(s):  See attached Notice of Acceptance.

### EEO Point of Contact Information

Kathryn D. Cornwell

EEO Point of Contact

254-287-4987          254-287-4426

Work Phone          Fax

Bldg. 1001, Rm W209

Address

Fort Hood, TX  76544

City, State, ZIP Code

kathryn.d.cornwell.civ@mail.mil

Email Address

| Case File Attached   Y   Y | N | (See www.cpms.osd.mil/ird for Recommended Data Submissions) | | |
|---|---|---|---|---|
| Remand::   Y | N  N | E-Processing::   Y | N | Mixed Case:  Y   N |

Priority Processing:

Request priority processing under IRD's efficiencies.  The following information is provided:

- The parties are available for investigation during any one of these three dates:

- Reason for the priority request: _____

- Documents outlined at the IRD Website for the accepted claim accompany this request for investigation.

- Email addresses and phone numbers for the parties to the complaint are included above

USA-Alvarez-001827

Remarks or Special Instructions:

Attachment:
As stated
Copy furnished (w/o atch)
Complainant
Complainant's Representative
Agency Representative
Management Representative

USA-Alvarez-001828

**Covel, Mark S CIV DODHRA DCPAS (US)**

| | |
|---|---|
| **From:** | Covel, Mark S CIV DODHRA DCPAS (US) |
| **Sent:** | Monday, July 21, 2014 2:39 PM |
| **To:** | kathryn.d.cornwell.civ@mail.mil |
| **Subject:** | Notice of Receipt – Complaint of Gilberto M. Alvarez, Agency Docket No ARHOOD14MAY01732 |
| **Signed By:** | mark.covel@cpms.osd.mil |

This is to let you know that the request for an investigation referenced in your memorandum was received in the Investigations and Resolutions Division (IRD) on 09 July 2014.  An Intake Investigator will begin an immediate review of the complaint file to determine what additional documents may be needed for the investigation.  The Intake Investigator may contact you if there is a need to clarify the claim(s) or if there are other questions arising from this initial review.  If you have any questions about the intake or investigative process, please feel free to contact us at the number below.

Mark Covel
Intake Services
Investigations and Resolutions Directorate
Defense Civilian Personnel Advisory Service
4800 Mark Center Drive, Suite 06G21
Alexandria, VA 22350-1100
Cell   ☎ 703-401-6799
Fax   ☎ 571-372-2090

FOR OFFICIAL USE ONLY - This email and any attachments may contain information that is protected from disclosure by Federal law (the Privacy Act of 1974) and should be viewed only by those with an official "need to know."  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited.  If you have received this communication in error, please notify me immediately by e-mail, delete the original message, and destroy any hard copies you may have created.  Any misuse or unauthorized disclosure may result in both civil and criminal penalties.

USA-Alvarez-001829

| From: | Gullett, Sandy CIV DODHRA DCPAS (US) |
| To: | "kathryn.d.cornwell.civ@mail.mil" |
| Cc: | "thaddeus.a.podbielski.civ@mail.mil"; "gilberto.m.alvarez.civ@mail.mil"; "samuel.t.boles.civ@mail.mil" |
| Subject: | Document Request – Gilberto Alvarez, Agency Docket No. ARHOOD14MAY01732 |
| Date: | Thursday, August 28, 2014 9:09:00 AM |
| Attachments: | Alvarezarhood14may01732DocReq.doc |

Ms. Cornwell:

I have reviewed the subject complaint file and determined that additional documents are necessary for the investigation.  I am forwarding a memorandum, with attachments, outlining the additional information needed. Please note that the suspense for these submissions is   September 12, 2014. If not received by that date, our current policy requires me to send a follow-up email to you.

**PLEASE NOTE**  We prefer to receive the requested documents from the EEO point of contact/EEO manager electronically, via upload to FileX, IRD's web-based file-transfer system.  FileX is a user-friendly, secure, cost-effective and efficient system.  If you require assistance using FileX, please call Ms. Susan Rose at 703-401-6811 as she will be pleased to help you.  If you are unable to use FileX, you may provide the requested documents electronically, via email attachment.  (FileX is for Agency use only.  Complainants and their representatives should provide their submissions via email, postal mail or fax.)  Send email attachments to me at ird.intake@cpms.osd.mil.  Email attachments should be relatively small (less than 50 pages).  Regardless of the method of electronic submission, please provide documents in PDF format.  Do not submit documents in other formats (e.g. Word documents, Excel spreadsheets, Power Point presentations). Ensure that all documents submitted are legible and printed on one side of 8 ½" X 11" paper.  If you must provide requested documents by mail, send to my attention at Investigations and Resolutions Directorate, Defense Civilian Personnel Advisory Service, 4800 Mark Center Drive, Suite 06G21, Alexandria, VA 22350-1100; fax to 571-372-2090.  Please be aware that we will convert your submission to an electronic format.  For this reason, we ask that the pages be uniform and not stapled or bound by other than removable clips or bands.  Please do not submit original documents.  More information is included in Attachment 1 to my memorandum.

Thank you in advance for your prompt attention to this matter.


SANDY GULLETT
Intake Assistant
Defense Civilian Personnel Advisory Service (DCPAS)
Investigations and Resolutions Division (IRD)
703-350-9645 FAX 571-372-2090

USA-Alvarez-001830



**DEPARTMENT OF DEFENSE**
CIVILIAN PERSONNEL ADVISORY SERVICE
INVESTIGATIONS AND RESOLUTIONS DIRECTORATE

August 28, 2014

MEMORANDUM FOR DEPARTMENT OF THE ARMY
HQ US ARMY GARRISON
EEO OFFICE, ATTN:  IMHD-EE
1001 761ST TANK BATTALION AVENUE, ROOM W209
FORT HOOD, TX  76544-5029

SUBJECT:  Data/Documentation/Witness Request
Discrimination Complaint of Gilberto Alvarez
Agency Docket No. ARHOOD14MAY01732

I have reviewed the subject case files and have determined that there is additional information we need from your organization to insure a complete and impartial investigation.  Attachment 1 is a list of the information we are requesting the agency to provide.  The material I have identified in this attachment is based on documents routinely needed for the type of claim(s) accepted in this complaint.  As the investigation proceeds, the need for additional documents may become apparent.  If you have any questions or concerns about my request, please do not hesitate to contact me at 703-350-9645.  Please provide this material to my attention by **September 12, 2014**.  If not received by that date, our current policy requires us to send a follow-up email to you.  Attachment 2 is simply general information about the investigative process.

A courtesy copy of this memorandum, with attachments, is also being provided to the involved parties (i.e., Complainant, the Complainant's Representative [if any], and the Agency Representative) to let them know what material we are requesting from the agency at this point in the investigative process.  This also serves to inform them that this is their opportunity to name witnesses and submit documents they believe are important to this investigation and that support their respective positions.  If witnesses are named, the individuals naming them should provide the following information (Attachment 3 may be used for this purpose):

- a brief explanation of the expected testimony of each witness
- the job title, organization and duty station of each witness
- a telephone number for each witness
- a postal and email address for each witness

The information about witness testimony and additional documents (if any) that the Complainant, Complainant's Representative, or Agency Representative may want to include in the record should be submitted to my attention by the suspense noted above.  Once this case is assigned, the Investigator will review these submissions for their relevance to the accepted claim(s).

USA-Alvarez-001831

If you have any questions about any aspect of the investigative process or the document request, please contact me at 703-350-9645 (Voice), (916) 498-6527 (Fax) or at sandy.gullett.civ@mail.mil.

SANDY GULLETT
Intake Services Assistant

Attachments:
As stated

cc:
Gilberto Alvarez, Complainant, by email
Samuel Boles, Complainant's Representative, by email
Thaddeus Podbielski, Agency Representative, by email

USA-Alvarez-001832

**THE INFORMATION BELOW TO BE PROVIDED BY THE AGENCY**

**REQUIRED INFORMATION AND DOCUMENTATION**
**COMPLAINT OF GILBERTO ALVAREZ**
**AGENCY DOCKET NO. ARHOOD14MAY01732**

1. Organization chart for the Orthopedic Brace Clinic in effect during the period of alleged harassment/hostile work environment.  Show organizational relationships between complainant, Mr. James Spell, MAJ Ivan Antosh, and COL Gregory Weaver.

2. Provide data (a list/spreadsheet/summary sheet) on employment within the Orthopedic Brace Clinic subordinate to the agency official(s) involved in the action(s) at issue, during the period of alleged harassment/hostile work environment.  Specifically provide:
   - Names and positions (title, pay plan, series, and grade) of all employees and supervisors in the organization(s) at the time.  If different, identify each person's organization segment.
   - Annotate **national origin** of all employees and supervisors.
   - Indicate which employees and management officials have had prior EEO activity.

3. Provide complainant's previous protected activity.
   - Identify the type of protected activity in which complainant participated, e.g. EEO complaint, grievance with EEO basis, representation, etc.
   - Provide date(s) of protected activity.
   - Claim(s), i.e., issue[s] and basis[es], current status, e.g. in process, settled, withdrawn, etc., and decision(s) issued
   - Provide the name and position (title, pay plan, series, and grade) of the agency official(s) involved.
   - If protected activity did not involve filing an EEO complaint, identify the matters opposed as discrimination.

4. Copy of Activity's policy statement on Equal Employment Opportunity (EEO) and harassment (sexual and non-sexual) in effect at the time of the alleged harassment/hostile work environment.

5. Information on EEO/harassment (sexual and non-sexual) training conducted during the two-year period prior to the alleged harassment at issue.  Identify method of training, dates of training, and list of attendees and certificates of training, if provided) required of employees, supervisors, and managers in complainant's organization segment during this one-year period.

6. Publications, e.g., newsletter articles, bulletin board items, etc., issued by the Activity on EEO/harassment (sexual and non-sexual) during the two-year period prior to the incidents of alleged harassment at issue.

7. Documentation, if any, showing whether the supervisor or any management official was made aware of the alleged incidents of harassment.  (If the complainant put management on

USA-Alvarez-001833

written notice that he believed he was being harassed/subjected to a hostile work environment, provide a copy of the written notice.)

8. Documentation of any management inquiry or investigation conducted based on the allegations of harassment/hostile work environment.

9. Documentation, if any, of corrective action(s) taken subsequent to management's knowledge of alleged incidents of harassment.

10. Name, position (title, pay plan, series, and grade), and **national origin** of the agency official(s) involved in the incidents of alleged harassment.

11. Email addresses and commercial telephone numbers for all involved parties.

**Documentation pertaining to the selection for the Supervisory Orthotist Prosthetist, GS-0667-11 position:**

12. Provide data (a list/spreadsheet/summary sheet) on selections (competitive) made within the organization(s) subordinate to the agency official(s) making the selection at issue for the two-year period prior to.  Specifically provide:
    - Name and **national origin** of selectee(s).
    - Position (title, pay plan, series, and grade) for which selected and date of selection.
    - Name, position (title, pay plan, series, and grade), and **national origin** of the selecting and approving official(s).
    - Indicate which selectees had prior EEO activity.

13. Position description for the position at issue.

14. Request for Personnel Action, SF 52 (both sides), requesting recruitment for the position at issue.

15. Merit promotion or vacancy announcement for the position at issue.

16. Job analysis used by HR personnel to make qualification determinations and develop referral instrument. (The job analysis will not be included in the final ROI but will be returned to the Activity for retention.)

17. Referral and selection instrument for the position at issue, annotated to reflect candidates' **national origin and prior EEO activity**.  The certificate should clearly identify the selectee and the selecting and approving official(s).

18. Applications or career briefs and all other documents submitted for the position at issue by complainant and the selectee.

USA-Alvarez-001834

19. Documentation identifying selecting or recommending panel members, and providing panel instructions, if applicable.  Identify panel member's position (title, pay plan, series, and grade) **national origin and prior EEO activity**.

20. Evaluation criteria and interview questions used by the panel, selecting official, and/or approving official.  Include notes, score sheets, and matrices.

21. Notification of Personnel Action, SF 50, effecting the selection at issue.

22. Documentation of complainant's notification of nonselection.

23. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning merit promotion in effect at the time of the selection at issue.  (Include the title page and index.  Do not provide the entire guideline/regulation unless requested.)

24. Provide the applicable/pertinent article(s) <u>excerpt(s)</u> from the negotiated union agreement, if applicable.  (Include cover page to identify source document.  Do not provide the entire negotiated agreement unless requested.)

25. Name of, and contact information (commercial work phone number and email address) for, the Human Resources (HR) specialist who handled the action at issue or who can provide information about the action.

26. Email addresses and commercial telephone numbers for all involved parties.

**Documentation pertaining to designation of Acting Chief position and additional duties:**

27. Provide data (a list/spreadsheet/summary sheet) on similar actions (employees designated as Acting Chief of the Orthopedic Brace Shop) within the Orthopedic Brace Shop/Clinic subordinate to COL Weaver during the two-year period prior to June 17, 2013.  Specifically provide:
    - Names and positions (title, pay plan, series, and grade) of all affected employees.
    - Annotate **national origin** of all affected employees.
    - Date(s) each employee was designated as Acting Chief.
    - Name and position of management official(s) involved.
    - **If reprisal is alleged**, indicate which employees had prior EEO activity.

28. Complainant's position description at the time of the action(s) at issue.  Also provide a copy of the position description for the GS-0667-7 position for co-worker (Mr. Matthew Perez).

29. Additional documentation pertaining to the contested assignment of additional/extra duties not previously provided, if any.

30. Data on assignments/extra duties given to the complainant and similarly-situated employees (other employees who occupy the same position [title, pay plan, series, and grade] as the complainant) in complainant's organizational segment during the two-year period prior to the

USA-Alvarez-001835

action(s) at issue.  Documentation, if any, showing work assignments made within the organizational segment during the two-year period (e.g. computer-generated productivity reports).

31. If the complainant compares himself with any particular co-worker(s), with respect to the assignment of duties, provide the full name, position (title, pay plan, series and grade) of these co-worker(s), and provide copies of the position description(s) and performance plan(s) of the co-worker(s) identified.

32. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning the assignment of duties in effect at the time of the action(s) (assignment of duties) at issue. (Include the title page and index.  Do not provide the entire guideline/regulation unless requested.)

33. Provide the applicable/pertinent <u>excerpt(s)</u> from the article(s) of negotiated union agreement, if applicable.  (Include cover page to identify source document.  Do not provide the entire negotiated agreement unless requested.)

34. Provide <u>excerpts</u> from the pertinent agency and local guidelines/regulations concerning the assignment of duties in effect at the time of the action(s) at issue.  (Include the title page and index.  Do not provide the entire guideline/regulation unless requested.)

35. Provide the applicable/pertinent <u>excerpt(s)</u> from the article(s) of negotiated union agreement, if applicable.  (Include cover page to identify source document.  Do not provide the entire negotiated agreement unless requested.)

**NOTE:  The documents are to be printed on one side of 8½" x 11" paper, and must be legible.  Given that we are moving towards maximum use of electronic transmission of documents, it is requested that hard copy submissions not be stapled or otherwise bound by other than removable clips and bands.  It is also requested that the material be labeled or organized in a way that shows clearly to which items (above) the material responds.  It is requested sections not be separated by tabbed dividers, but rather by untabbed, 8½" x 11" bond paper, with any explanatory information printed on the divider pages.**

If you believe you have already provided any of the above requested information/documentation, please call Sandy Gullett at 703-350-9645 to discuss.  If any of the information/documentation requested above are not available, you may make a substitution after coordination with this office.  If you are unable to provide requested information/documentation, include a statement explaining why the information/documentation is unavailable.  If a document is especially voluminous, provide an extract of the pertinent portions of the document and include instructions regarding where the complete document can be reviewed**.**  All lists must be signed and dated.

**You are encouraged to sanitize all personal identifiers not necessary to a review of the merits of the complaint from the documents you provide.**  Sanitized information would generally include social security numbers, home addresses and home telephone numbers.  If you sanitize any information beyond social security numbers, home addresses and home telephone numbers, please advise IRD of the type of additional information that was sanitized and from

USA-Alvarez-001836

what specific documents.  Please do **<u>not</u>** sanitize any names from the records you provide to IRD.  Furthermore, please do **<u>not</u>** sanitize any EEO protected group information (e.g., race, sex, age, or other EEO protected group data) from the records you provide.  This information is necessary for the purpose of addressing the merits of the complaint filed.  If you have any questions regarding the sanitization of documents, please call Sandy Gullett at 703-350-9645 to discuss.

USA-Alvarez-001837

## INFORMATION ON THE INVESTIGATIVE PROCESS

The following information is provided to assist you in understanding the process used to investigate an EEO complaint.

The Investigations and Resolutions Division (IRD) (formerly the Office of Complaint Investigations) will conduct the investigation. You may be required to provide an affidavit or a declaration to an investigator during an on-site meeting or in a written request or telephone call, or you may be required to participate in a Fact-Finding Conference.  The Fact-Finding Conference is a meeting that may be conducted in person or through video teleconference facilities.  The method of investigation used will be based on the specific requirements of the case and will ensure thorough and efficient consideration of the complaint.  The investigator and the EEO Office will make specific information concerning the method of investigation available to you.

In all individual complaints of discrimination, the complainant has the initial burden of showing, through a preponderance of the evidence, that discrimination may be inferred from management's action.  This may be done by showing that the complainant has been treated less favorably than other employees who are similarly situated to the complainant or by providing some other basis for inferring discrimination has occurred.  When reprisal is alleged, the complainant must show that he/she had previous involvement in protected EEO activity, that management was aware of this activity, that the complainant's employment situation was adversely affected subsequent to the activity, and that there is some basis for linking the previous protected EEO activity with the adverse effect to the employment situation.

Once the complainant has been given the opportunity to explain why he or she believes discrimination has occurred, management witnesses will be asked to respond to the complainant's allegations.  This is management's opportunity to provide legitimate, nondiscriminatory reasons for their actions.  Other witnesses requested by the complainant or management may be called if the investigator determines their testimony may be relevant to the issues or allegations in the complaint and will not be redundant.

The investigator prepares an Investigative File to include all relevant and material documentation and testimony, and a Report of Investigation to summarize and/or analyze the evidence gathered.

USA-Alvarez-001838

## PROPOSED WITNESSES
## (GUIDANCE)

(*Please **prioritize the witnesses you propose** to support your position.  And, **for each witness you propose, please provide the following information**.*)

**1a.  First Proposed Witness's Name (Last, First):**
1b.  Witness's Job Title:
1c.  Witness's Organization and Duty Station or Location:

1d.  Witness's Contact Information:
Commercial telephone number (including area code):
Email address:
Mailing address:

1e.  Brief explanation of the testimony this witness is expected to provide regarding the claim(s) accepted for investigation.  (For example, the witness was involved in the action at issue, was present when the events at issue occurred, or can provide a first-hand account of similar disparate treatment or hostile work environment.):


**2a.  Second Proposed Witness's Name (Last, First):**
2b.  Witness's Job Title:
2c.  Witness's Organization and Duty Station or Location:

2d.  Witness's Contact Information:
Commercial telephone number (including area code):
Email address:
Mailing address:

2e.  Brief explanation of the testimony this witness is expected to provide regarding the claim(s) accepted for investigation:


**3a.  (Continue to list your proposed witnesses in the above format using additional sheets.)**

(*The investigator assigned to investigate the complaint will use the information you provide to determine whether or not the proposed witness(es) has (have) testimony to provide that is relevant and material to the accepted claim(s).  Therefore, it is important that you include all the information listed above for each witness you propose.  And, because the investigator may not be able to interview all the witnesses you propose, it is important that you list them in priority order.  Thank you in advance for your adherence to this guidance.*)

278

USA-Alvarez-001839



USA-Alvarez-001840

DEPARTMENT OF DEFENSE

INVESTIGATIONS AND RESOLUTIONS DIVISION


INVESTIGATION IN THE COMPLAINT OF

GILBERTO M. ALVAREZ

AGENCY DOCKET NO. ARHOOD14MAY01732




FACT-FINDING CONFERENCE

OCTOBER 22, 2014

FORT HOOD, TEXAS




INVESTIGATOR: LYNN C. SMITH

REPORTED BY:  AMBER KIRTON, KEN OWEN & ASSOCIATES

```
 1                      A P P E A R A N C E S

 2

 3   BEFORE:    Mr. Lynn C. Smith, Investigator
                DEPARTMENT OF DEFENSE
 4              CIVILIAN PERSONNEL MANAGEMENT SERVICES
                Investigation & Resolutions Division
 5              P.O. Box 691735
                Houston, Texas  77269
 6              (703) 350-9283
                EMAIL: Lynn.C.Smith4.civ@mail.mil
 7
     COMPLAINANT:  Mr. Gilberto M. Alvarez
 8
     AGENCY
 9   REPRESENTATIVES:  Mr. Thaddeus Podbielski & CPT Mary Jones
                       Labor Counselors for the Department of
10                     the Army

11
     CERTIFIED COURT
12   REPORTER:       Ms. Amber Kirton, CSR #8110

13
     ACTIVITY DOCKET
14   NUMBER:         ARHOOD14MAY01732

15

16

17

18

19

20

21

22

23

24

25
```

USA-Alvarez-001842

3

```
 1                          I N D E X

 2   WITNESSES:                                          PAGE

 3   GILBERTO M. ALVAREZ......................................  10

 4   MAJ IVAN ANTOSH.........................................  58

 5   COL GREGORY WEAVER......................................  75

 6   MATTHEW PEREZ........................................... 102

 7   DONNA BOWLING.......................................... 134

 8   VALENTIN CRUZ.......................................... 169

 9

10   REPORTER'S CERTIFICATE................................. 203

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2                 (Witnesses sworn.)

 3              THE INVESTIGATOR:  Let the record begin at 11:15

 4    on October 22nd, 2014.  This is a fact-finding conference being

 5    held at III Corps in Fort Hood -- please correct me if I'm

 6    wrong -- III Corps in Fort Hood EEO office, 10017 61st Tank

 7    Battalion Avenue, Room W209, Fort Hood, Texas.

 8              We can go off the record.

 9                 (Off the record.)

10              THE INVESTIGATOR:  We were just off the record.

11    We're back on the record.  We were discussing the fan and sound.

12              My name is Lynn C. Smith.  I'm an investigator

13    with the Department of Defense Civilian Personnel Management

14    Services, Investigation Resolution Division.  This proceeding is

15    an administrative investigation conducted in accordance with

16    Section 1614 of Title 29 of the Code of Federal Regulations.

17    Its purpose is to establish a record of evidence relevant to the

18    issues accepted for investigation and to do so in a manner that

19    affords both parties a fair opportunity to present their facts

20    and position in the record.

21              Present at this time is the Complainant,

22    Mr. Gilberto Alvarez.  The Complainant's representative is his

23    wife, Leann Alvarez.  Let the record show that Ms. Alvarez was

24    brought in as the Complainant's representative when, last week?

25              MS. ALVAREZ:  Wednesday of last week.
```

USA-Alvarez-001844

1          THE INVESTIGATOR:  Wednesday of last week, which

2    was -- anybody know the date?

3          CPT JONES:  October 15th, sir.

4          THE INVESTIGATOR:  You can put that in.  Which

5    was the 15th of October 2014.  The Agency representatives are --

6    and I'm going to have you-all say your name, please.

7          CPT JONES:  CPT Mary Jones.

8          MR. PODBIELSKI:  And Thad Podbielski.

9          THE INVESTIGATOR:  Could you please spell your

10   name, sir, for the record?

11         MR. PODBIELSKI:  First name is T-h-a-d.  Last

12   name is P-o-d-b-i-e-l-s-k-i.

13         THE INVESTIGATOR:  Thank you, sir.  Since

14   Complainant's allegations are made against the Agency, the

15   Agency rep is here to represent the Agency and not any specific

16   management official.  The principal agency witnesses that will

17   testify on behalf of management in this complaint are here.

18   They will be present to hear the Complainant's testimony but

19   will be excused with other witnesses -- when other witnesses

20   testify.  The management witnesses may be recalled to provide

21   additional information if new evidence makes it necessary.

22         I might add on the record that the pre

23   fact-finding conference lasted a little longer in that the

24   representatives needed to speak with higher management in order

25   for a resolve of this matter.  The court reporter is Amber

1    Kirton, who will record the verbatim testimony of this

2    proceeding.  A brief preliminary hearing was held prior to this

3    conference to explain procedural aspects, confirm witnesses and

4    to explore possibility of settlement and to ensure both parties

5    have been afforded an opportunity to review the documents in the

6    file.

7              Mr. Alvarez, would you acknowledge for the record

8    that you have reviewed your file or parts of your file?

9              THE COMPLAINANT:  Yes, I have.

10             THE INVESTIGATOR:  Okay.  And Counsel, could you

11   please acknowledge --

12             Off the record.

13                  (Off the record.)

14             THE INVESTIGATOR:  Just wanted to get some

15   clarification.  CPT Jones will be responding for counsel for

16   Agency.  CPT Jones, have you had an opportunity to review the

17   record?

18             CPT JONES:  Yes, I have.

19             THE INVESTIGATOR:  Thank you.  The parties are

20   advised that the information provided here is to not be

21   considered confidential and that it may be placed in the file

22   and shown to the interested parties.  The claims that we have

23   set before us, the agency number is ARHOOD14MAY01732.

24   Mr. Alvarez and CPT Jones, could you acknowledge is that

25   correct?  I'll repeat it again.  Agency Number ARHOOD14MAY01732.

USA-Alvarez-001846

1          CPT JONES:  Yes, sir.

2          THE INVESTIGATOR:  Thank you very much.  I've

3  already sworn everybody in to this point, everybody that will be

4  testifying at this point.  I'm going to ask now Mr. Alvarez or

5  his representative, not both, one or the other, if you have an

6  opening statement.  If not, that's fine.

7          THE COMPLAINANT:  I do have an opening statement

8  and I also want to clarify in regards to the document that you

9  just spoke of, the way that the wording in comparison to my

10  claims accepted.  Number one states that the claims under

11  investigation are, as it reads, was Complainant subject to

12  hostile work environment on the basis of his national origin

13  when where --

14          THE INVESTIGATOR:  Excuse me, Mr. Alvarez.  I

15  want to stop you right there.  I don't want to go through all of

16  the claims.  But if you could -- if you could in short tell me

17  what you see that's --

18          THE COMPLAINANT:  That is inaccurate and it's the

19  same for when it appears again, that my accepted claims for

20  investigation was Complainant discriminated against and subject

21  to a hostile work environment.

22          THE INVESTIGATOR:  Okay.  Is it your testimony

23  here today that it should not read subjected to a hostile work

24  environment?

25          THE COMPLAINANT:  No.  My testimony is that it

1  should be as the original acceptance and the original acceptance

2  reads was Complainant discriminated against and subjected to

3  hostile work environment on the basis of national origin,

4  Hispanic, when --

5              THE INVESTIGATOR:  Okay.  That's --

6              THE COMPLAINANT:  The word discrimination is left

7  out of it.

8              THE INVESTIGATOR:  Oh, because I have that in

9  mine.  In the formal complaint of discrimination you allege you

10 were discriminated against and subjected to a hostile work

11 environment on the basis of your national origin, Hispanic.

12             THE COMPLAINANT:  Okay.  Not using this one,

13 then.

14             THE INVESTIGATOR:  The one that I have is what

15 was accepted.

16             THE COMPLAINANT:  So that's what I had the

17 conflict with is the way this one is worded.

18             THE INVESTIGATOR:  Let me see that.  Okay.  Let

19 the record show that the content is the same.  It's just the

20 arrangement of the words, but it's basically the same.  The

21 Complainant has was he subjected to a hostile work environment

22 on the basis of his national origin, Hispanic.  The claims that

23 was accepted states in your formal complaint of discrimination

24 you allege you were discriminated against and subjected to a

25 hostile work environment on the bases of your national origin,

USA-Alvarez-001848

9

1    Hispanic, which basically reads the same.  It's saying the same

2    thing.  It's just worded a little differently.  One is just

3    shortened a little bit more than the other.

4                    THE COMPLAINANT:  So we'll be using the one with

5    discrimination?

6                    THE INVESTIGATOR:  Yes.

7                    THE COMPLAINANT:  On Letter B the ending of the

8    thing where it says --

9                    THE INVESTIGATOR:  Mr. Alvarez, let me stop you

10   right there.  We're going to go through each incident and I'm

11   going to give you a chance to respond to if something -- you

12   know, if something is not correct.  But we have to go on what

13   was accepted in the claim, not what when you initially went

14   in --

15                    Let's go off the record.

16                        (Off the record.)

17                    THE INVESTIGATOR:  We were just off the record

18   and getting some clarification on what was accepted and what was

19   not accepted as well as the wording for the accepted claims.

20   The investigator indicated that -- instructed Mr. Alvarez to --

21   as we go through each claim that he could explain what was

22   correct and what's not correct or if there is anything that he

23   wants to take out during this proceeding.

24                    GILBERTO M. ALVAREZ,

25   having been previous sworn, testified as follows:

1                          EXAMINATION

2   BY THE INVESTIGATOR:

3        Q.   Mr. Alvarez, could you please state your full name?

4        A.   Gilberto M. Alvarez.

5        Q.   Could you also identify your national origin for the

6   record?

7        A.   National origin is Hispanic.

8        Q.   Okay.  Thank you.  At the time of these alleged

9   incidents you occupied the position of what?

10       A.   An orthotist/prosthetist GS-9, Step 10.

11       Q.   Could you also -- could you spell that for the record?

12       A.   It's o-r-t-h-o-t-i-s-t, orthotist.

13       Q.   And could you repeat your grade?

14       A.   GS-9, Step 10.

15       Q.   How long have you been assigned to your position?

16       A.   Since 2007 January.

17       Q.   And the name of the organization that you've been

18   assigned to since that time?

19       A.   CRDAMC.

20       Q.   I'm sorry?

21       A.   CRDAMC.

22       Q.   Is that an acronym?

23       A.   Yes, it is.

24            THE INVESTIGATOR:  I would ask everybody on the

25   record, for acronyms, please spell those out first and then we

1    can use the acronym.

2        Q.    (BY THE INVESTIGATOR)   So what is -- could you please

3    repeat that?

4        A.    Carl R. Darnell Army Medical Center.

5        Q.    All right.  And the acronym is?

6        A.    C-R-D-A-M-C.

7        Q.    Okay.  Thank you.  What directorate do you fall under?

8        A.    The Department -- DCCS and under the Department of

9    Clinical Services.

10        Q.    And DCCS stands for?

11        A.    Department of Clinical Services.

12        Q.    And you said two Cs.  Department Clinical -- what's

13    the other C for?

14        A.    Good question.

15            CPT JONES:    Deputy Commander of Clinical Services

16    for Fort Hood.

17        A.    That falls under the department of rehab.

18            THE INVESTIGATOR:    Okay.  Thank you both.

19        Q.    (BY THE INVESTIGATOR)   Who was your supervisor during

20    that time?  Provide their -- your first level supervisor first.

21    Provide his name and his title and his rank.

22        A.    For 2007?

23        Q.    Yes.  During the time of your incidents.

24        A.    During the time of my incidents?

25        Q.    Of your incidents, yes.

USA-Alvarez-001851

1      A.    The outgoing supervisor that initiated which

2   ultimately I ended up here because of that, James Spell.

3      Q.    And his title and rank or grade?

4      A.    Chief orthopedic brace shop, GS-11.

5      Q.    And how long has he been your supervisor or was he

6   your supervisor?

7      A.    Since 2007 to May 2013.

8      Q.    And is it my understanding that Mr. Spell is now

9   retired?

10     A.    Yes.

11     Q.    And he retired when?

12     A.    Officially the 31st of August 2013.

13     Q.    Okay.  Do you -- can you state for the record what

14  Mr. Spell's -- what you know his national origin to be?

15     A.    Caucasian.

16     Q.    And you know that because of sight, did somebody tell

17  you or in conversation?

18     A.    Sight.

19     Q.    Okay.

20     A.    With German background.

21     Q.    Okay.  You say German background because of?

22     A.    He's born in Germany.  He's German.

23     Q.    Did he tell you that?

24     A.    Yes.

25     Q.    So through conversation you learned of his national

1  origin?

2      A.   Yes.  He also spoke the language and I know the

3  language as well so we spoke in German sometimes.

4      Q.   Who was your second-level supervisor?  Their name,

5  their grade and rank -- grade or rank.  Second-level supervisor

6  who was above Mr. Spell.

7      A.   At that point it was MAJ Gloystein.

8      Q.   Can you spell that for the record?

9      A.   No.

10           THE INVESTIGATOR:  Could somebody spell that for

11  the record?

12           MR. CRUZ:  It's G-l-o-y-s-t-e-i-n.  David first

13  name.

14           THE INVESTIGATOR:  Thank you, Mr. Cruz.

15      Q.   (BY THE INVESTIGATOR)  Do you know his grade and rank?

16      A.   At the time it was major.  He's lieutenant colonel

17  now.

18      Q.   Okay.  What was his title?

19      A.   I believe at that time it was chief of orthopedic

20  services.

21      Q.   Okay.

22           THE INVESTIGATOR:  I'm going to ask Mr. Cruz is

23  that correct?

24           MR. CRUZ:  That is correct.

25      Q.   (BY THE INVESTIGATOR)  How long were you -- excuse me.

1   Were you aware of his national origin?

2       A.    Through sight, yes.

3       Q.    And what do you believe his national origin to be?

4       A.    Caucasian.

5       Q.    How long were you supervised by MAJ Gloystein?

6       A.    As the question was he was my senior rater.

7       Q.    Okay.  So how long were you supervised by him?  Just

8   approximately if you don't know.

9       A.    I would have to look at my evaluations, but I would

10  say since he was there.

11      Q.    Two years, three years?

12      A.    I would say -- I recall his name on my evaluation at

13  least two years.

14              THE INVESTIGATOR:  Mr. Cruz, are you familiar

15  with that?

16              MR. CRUZ:  He was.  I don't know the exact time

17  frame.  He may have also had another chief prior to him.

18              THE INVESTIGATOR:  But about two years sounds

19  right?

20      A.    That is correct.  The one before was Graves.

21      Q.    (BY THE INVESTIGATOR)  Mr. Alvarez, you indicate in

22  your claim that you were discriminated against and subjected to

23  a hostile work environment due to your national origin,

24  Hispanic.  For the record, could you state what was the hostile

25  work environment?  Could you explain what the hostile work

1  environment was?

2      A.   In how much detail?  We could be here for a day.

3      Q.   Briefly.

4      A.   It came to the point where coming to work was

5  unpleasant.

6      Q.   Could you explain?

7      A.   Because of the actions that the Agency allowed.

8  Examples?

9      Q.   Also names.  Could you be specific?

10     A.   Specifically Mr. Spell.

11     Q.   Can you explain what Mr. Spell did to cause a hostile

12  work environment?

13     A.   Can I start with he's the person that I can testify as

14  being a racist against -- actually, he's a racist against

15  everybody.  He has no specific one.  But particularly me he has

16  told me to my face how much he hated me, how much I shouldn't be

17  here, he wished I wasn't here and that one specific statement

18  that I recall that here we give you -- we give you an

19  opportunity and y'all try to get more.

20     Q.   What made you --

21     A.   He has said racial and discriminatory remarks either

22  in front of me or where I could hear him about -- okay, the N

23  word, Bible pusher, lesbians, homosexuals.

24     Q.   What did he say specifically about national origin?

25     A.   In regards to Hispanic?

1    Q.   Yes.

2    A.   He used the word beaners and wetbacks.

3    Q.   And when did he first start using these racial slurs

4  to you?

5    A.   I would say probably since he was eight.  Oh, to me,

6  I'm sorry.

7    Q.   Yes.

8    A.   Right off the bat from the first day.

9    Q.   And that would be around when?

10   A.   January 7th, 2007.

11   Q.   January 7th, 2007?

12   A.   January 7th, 2007.

13   Q.   And did you report the incidents?

14   A.   I did not.  I did -- I did express my disapproval.

15   Q.   Who did you express that to?

16   A.   To him.

17   Q.   Okay.  Now, this happened back in 2007 and I don't

18  want to get back from the issues and where we are today.  You

19  expressed them to him.  Did they stop after you told him that

20  you didn't like them?

21   A.   He was superior over everything and that's the way he

22  looked at himself, so no.

23   Q.   So your testimony is that you did not --

24   A.   Go beyond him?

25   Q.   Yes.

1      A.   No.

2      Q.   Any particular reason why not?

3      A.   Because I live through a code that I stick with and

4  I've learned that since around 2000 -- or I'm sorry, 1998 or so.

5  I was doing duty with a captain, a guy was in the military then.

6  In conversation he mentioned to me what people say and what

7  people do is a reflection of them, not you.  That's the biggest

8  reason.

9      Q.   So it's your testimony today that from 2007 until the

10 time Mr. Spell retired you never complained about any of his

11 racial -- of his alleged racial comments?

12     A.   I did not complain beyond him.

13     Q.   Okay.  That's fine.

14     A.   I did rebuttal and say -- or walked away or --

15     Q.   Okay.  That's fine.  How did his comments affect your

16 environment?  You indicated that you were working in a hostile

17 work environment.  Could you explain how his comments or actions

18 affected your work environment?

19     A.   When you work under someone that has made it known to

20 you that he dislikes you then I have to go through certain

21 defenses.  As I mentioned I used that quote as I mentioned

22 earlier and just, quite frankly, I had a job to do so I ignored

23 it because he just -- it would stop.  He would say it but then

24 he would stop and we would move on.  That's how the days went.

25 That's the best way I can tell you.

1    Q.    Okay.  But could you give me a little bit more of how

2    was your environment made hostile?

3    A.    When someone treats you that way already you're

4    uncomfortable and, yeah, I start thinking what can I do about it

5    and it keeps my mind occupied except, you know, instead of what

6    the job is at hand.  And again, I ignored and I ignored because

7    he never really went beyond those type of things, of words,

8    until he left, then that's why we're here today through his

9    actions.

10   Q.    Okay.  You said that he treated you a certain kind of

11   way.  How did he treat you?

12   A.    As an example he would suggest something, whatever it

13   may be -- and he's done it to I'm sure all his employees.  I

14   know I've heard him tell Matthew Perez the same thing.  His

15   answer to everybody when we even questioned or tried to talk

16   about something that he brings up, he always had the same

17   answer.  Because I say so.

18   Q.    And how did that disrupt your business day, your work

19   environment?

20   A.    You can imagine with that -- I'm very resilient so the

21   fact that he is creating a hostile environment and he is doing

22   these things, I'm a person that I have to overcome this.

23   Q.    Excuse me.  I need to comment.  When you say these

24   things, you mentioned that he raised his voice.

25   A.    I'm sorry.  Yes.

1      Q.    Okay.  What else?

2      A.    The slurs, the treatment, the showing of his

3  superiority.

4      Q.    How did he show his superiority?

5      A.    As the previous example, because I say so.  There was

6  no, okay, let's talk about this, et cetera.

7      Q.    Did you ever question him about it?

8      A.    It did no good.  Yes, I had -- yes, I did because --

9  and ultimately whatever some of these issues that he was talking

10  about I came up with a solution he accepted it.  So I move on.

11      Q.    What was the solution?

12      A.    The solution like, for instance, we're trying to

13  create a template that to make doing the encounters up faster.

14  And he came to me and he said that I need to work on it and I

15  need to do it.

16      Q.    He needs to work on --

17      A.    I need to work on creating a template, which is a --

18  when we do medical records and annotating we were physically

19  doing it per -- we were typing it and typing it and typing it.

20  Well, one of the -- and that obviously takes a long time.  So

21  one of the solutions brought forth was, hey, you can create a

22  template so whenever a certain situation is the same or require

23  the same verbiage and wording then you can actually create it

24  and just pick it and it comes --

25      Q.    Okay.  Let me stop you right there.  I don't want you

USA-Alvarez-001859

1    to get confused.  When I say how did he treat you or that he was

2    going to work on it, I'm speaking in terms of the environment,

3    the hostile work environment.  Did he ever address I'm going to

4    work on how I talk to you, the things I say to you?  I'm only

5    talking about the environment, how he made your environment

6    hostile.

7         A.   The way he made my environment hostile is that there

8    was no talking to try to stop anything.

9         Q.   Okay.  Mr. Spell, again, was your immediate

10   supervisor?

11        A.   Yes.

12        Q.   And he did your evaluations?

13        A.   Yes.

14        Q.   What was your last evaluation that you received from

15   him?

16        A.   All my evaluations that I looked up since I believe

17   2007 are all excellent except for one that I believe was

18   successful -- or yeah.

19        Q.   Did all these --

20        A.   They were all excellent.

21        Q.   Did all these excellents come from Mr. Spell?

22        A.   Not all of them.  Just since I've been here.

23        Q.   How many excellents --

24        A.   Before he left.

25        Q.   How many excellents came from Mr. Spell?

1      A.   All the ones he did.  Six.

2      Q.   Okay.  So it's your testimony that he created a

3    hostile work environment but he gave you six excellent

4    appraisals?

5      A.   In what I was being evaluated on, yes.

6      Q.   Who hired you?

7      A.   I was on priority placement and when the job came

8    available it was offered to me and I accepted.

9      Q.   Who offered you the job?

10      A.   HR, because under that priority placement, I guess,

11    when a job becomes available that matches mine they ask me.

12      Q.   In relation to the hostile work environment, did you

13    ever discuss -- you say you didn't discuss that with management.

14    Did you discuss it with any coworkers?

15      A.   Yes, one, the outgoing receptionist Ms. Shelton, which

16    I'm not really sure where she's at now.  I have discussed it

17    with Ms. Bowling to a certain extent.

18      Q.   What have you discussed with Ms. Bowling?

19      A.   I don't remember the whole discussion.  I do remember

20    that the conclusion, yes, Mr. Spell is a racist.

21      Q.   She told you that?

22      A.   Yes.  Everybody knows it now that I recall.

23      Q.   Excuse me.  Were any of the conditions of your

24    employment changed by Mr. Spell or would you come in, clock in,

25    do your job, go home?

1      A.    No.   He assigned me extra duties that he was

2   responsible for, safety officer, and it's in his job

3   description, infectious control officer.

4      Q.    Did he do that -- are you saying -- do you believe

5   that he was doing that to create a hostile work environment by

6   assigning you those duties?

7      A.    That to include so he wouldn't have to do it.

8      Q.    Okay.   But do you believe that he was doing that to

9   subject you to a hostile work environment?

10     A.    Yes, I do.

11     Q.    Why?

12     A.    Because he had the time to do it but he forced more

13   work on me and those weren't the only ones.

14     Q.    Did you ever complain about the duties that he asked

15   you to do, the extra duties?

16     A.    No.

17     Q.    Why not?

18     A.    Because those things, to me, since I retired as a

19   soldier I knew how to do and instead of arguing with him I just

20   went ahead and did it.

21     Q.    Okay.   So --

22     A.    Knowing that it is his job description and

23   responsibility.

24     Q.    Okay.   I don't want to confuse you, but with him

25   giving you those extra duties how was that making the

1    environment hostile?

2         A.    That gave me less time to do the rest of the things

3    that I needed to do and he would just sit back.  So that in

4    itself to me was a hostile environment.

5         Q.    Did any of your conditions of employment change in

6    terms of benefits?

7         A.    Until I got here I've always -- almost with every

8    evaluation, and I do have that, I received awards, whether it

9    was monetary or days off.  Since I've been here I've yet to even

10   get one.

11        Q.    Now, are we still talking about Mr. Spell?

12        A.    Yes.  Yes.

13        Q.    Okay.  So you're going back to 2007 again?

14        A.    I'm sorry.  What was your question?

15        Q.    How has your benefits been affected -- has your

16   employment benefits been affected as a result of the alleged

17   hostile work environment?

18        A.    I asked him on several occasions for an upgrade and he

19   just refused to even start or even think about it or act on it.

20        Q.    Have you ever asked for a desk audit?

21        A.    That I look at it now that's what I was asking for but

22   I didn't know it.

23        Q.    Okay.  Did you ask him specifically could I get a desk

24   audit?  Did you ever tell him I do more work than what I was

25   hired to do?

1      A.    I was not aware of that terms or that procedure.

2      Q.    Okay.  You were aware that you were doing more work

3 than you were supposed to do?

4      A.    I was doing, yes.

5      Q.    Is that your testimony?

6      A.    That is my testimony.

7      Q.    Did you ever go and complain to anybody higher than

8 Mr. Spell?

9      A.    No.

10     Q.    Any particular reason why not?

11     A.    No.

12     Q.    Did his comments or actions interfere with your work

13 performance?

14     A.    If getting under somebody's skin is part of that and I

15 had to step back and recover, then yes.

16     Q.    Now, you indicated on the record that most or almost

17 all of you evaluations have been excellent given to you by

18 Mr. Spell.

19     A.    Yes.

20     Q.    Okay.  So I'm going to rephrase the question.  Did his

21 comments or actions interfere with your work performance?

22     A.    I'm sorry.?

23     Q.    Did his comments or actions interfere with your work

24 performance in that most of the evaluations you received from

25 him were excellent?  In other words, it sounds like your

1    performance wasn't affected if you were getting excellent

2    evaluations.

3        A.   And that's due to my own resilience and moving on.

4        Q.   So what you're saying is that he recognized -- that he

5    recognized that you were doing your job and performing at the

6    level that you were supposed to be performing at and that he

7    gave you an excellent for doing that?

8        A.   Yes.  In addition to that he knew I was doing his job

9    and he knew that at the very least if he would do that there

10   would be less friction.

11       Q.   Well, what we're going on is -- again, this is a

12   fact-finding conference.  We're going on the facts, something

13   that we can read, touch or feel.  We can touch an evaluation and

14   see what he gave you.  We're not going on hypothetics.

15       A.   I misunderstood that.

16       Q.   We can't put out what he might be thinking other than

17   the fact that he gave you an excellent evaluation -- several

18   excellent evaluations for your performance.  Did you ever

19   complain to him that you should receive something higher than an

20   excellent performance evaluation?

21       A.   That is the highest.

22       Q.   Okay.  Thank you, sir.  So how were you actually

23   impacted by the hostile work environment if Mr. Spell indeed

24   gave you the highest performance evaluation that you could

25   receive?  I'll repeat the question.  How was your environment

1   made hostile if he gave you the highest evaluation -- the

2   highest performance evaluation that you could receive being

3   excellent?

4       A.   I can't -- I don't have an answer for that.  I don't

5   understand because that happened once a year.

6       Q.   Okay.  That's fine.  Are you aware of any other

7   employees in your section that was being subjected to a hostile

8   work environment by Mr. Spell?

9       A.   Matthew Perez.

10      Q.   Okay.  And how was he -- have y'all talked about it?

11      A.   No.

12      Q.   Any particular reason why not?

13      A.   You spoke to him.

14      Q.   Well, I'm asking the questions.

15      A.   You can't -- I just -- to approach him is almost like

16  you've got to think about it.

17      Q.   Okay.  Now, it's your testimony that he was being

18  subjected to a hostile work environment but you never talked to

19  him.

20      A.   It was right in front of me.

21      Q.   No, I'm asking you.  How do you know he was subjected

22  to a hostile work environment?

23      A.   Mr. Spell gave him also the duties that he was

24  responsible for and as I believe with him he promised him

25  things.  Of course he never came through with them.  But he had

USA-Alvarez-001866

1  us to --

2       Q.   Let me help you out.  Did Mr. Perez ever complain to

3  you that he was being subjected to a hostile work environment by

4  Mr. Spell?

5       A.   No.

6       Q.   Did he ever complain to you?

7       A.   Not that I recall at this time.

8       Q.   Did anybody else tell you that Mr. Perez was being

9  subjected to a hostile work environment by Mr. Spell?

10      A.   On numerous occasions.  Now, he spoke to Mr. Spell

11  differently than I did.  They actually screamed at each other

12  and that was because of issues such as what you're asking about.

13      Q.   But that's not my question.  I'm asking about the

14  environment.

15      A.   That is the environment.

16      Q.   We're talking about Mr. Perez.  You said that he was

17  subjected to a hostile work environment as well.  My question

18  was, did he tell you that?

19      A.   No.

20      Q.   Okay.  How did you find out that he was being

21  subjected to a hostile work environment?

22      A.   Because he was given the responsibility of the signing

23  for property and things that go along with that.

24      Q.   So it's your testimony that because he was given extra

25  duties, even though Mr. Perez never complained to you about it

28

1    or complained to anybody else about it and you have no

2    first-hand knowledge that he complained, your testimony is that

3    because he received extra duties you consider that to be a

4    hostile work environment?

5         A.   Can you repeat that, please?

6         Q.   You consider Mr. Perez's environment to be hostile

7    solely on the fact that Mr. Spell gave him extra duties?

8         A.   Then no.

9         Q.   Okay.  Do you care to rephrase your testimony, how you

10   believe Mr. Perez was subjected to a hostile work environment?

11        A.   I'm going to give you an answer and then that would be

12   it.  Mr. Spell treated us like slaves.

13        Q.   You want to explain that?

14        A.   That's my answer.

15        Q.   When you say treated us, who are you referring to?

16        A.   Specifically me and Mr. Perez.

17        Q.   And do you believe that had anything to do with your

18   national origin?

19        A.   We're both Hispanic.

20        Q.   You indicated earlier that Mr. Spell gave favors or

21   did favors for Mr. Perez; is that correct?

22        A.   What I said earlier talking about before this?

23        Q.   Yes.

24        A.   What I said was that I believe that Mr. Spell and

25   Mr. Perez's father had associations and because of that

1    association that's how I believe that Mr. Perez got hired --

2    Matthew Perez got hired here.

3         Q.    Hired by whom?

4         A.    Mr. Spell.

5         Q.    And if Mr. Spell hired him because of knowing his

6    father, do you believe that he would hire him just to create a

7    hostile work environment, knowing his father?

8         A.    No.

9         Q.    I'm sorry?

10        A.    Well, that's an interesting question because there was

11   a comment that I overheard in regards to Mr. Perez's father that

12   he causes trouble everywhere he's been.  But I cannot recall.

13   It might have been Ms. Bowling, actually.

14        Q.    Okay.  I'm going to move on.  Are you familiar if the

15   Agency has a hostile work environment policy?

16        A.    Yes, they do.

17        Q.    Okay.  Where is it posted?

18        A.    In various places.  Mostly all the information you can

19   find on the hospital's Website.

20        Q.    Okay.

21        A.    And if it's supposed to be on a bulletin board and I

22   found time to do it then it's there.  If not, it's not there.

23        Q.    So you are aware of their hostile work environment and

24   harassment policy?

25        A.    Yes, I am.

1     Q.    What does that policy say?

2     A.    Well, primarily it should not be tolerated.

3     Q.    Okay.  And does it say who to report to --

4     A.    Yes, it does.

5     Q.    -- in the event that that happens?

6     A.    Yes, it does.

7     Q.    And does it say it's a violation of the law?

8     A.    I don't recall.

9     Q.    Okay.  Is it your testimony that you're aware of the

10    policy and you're aware that it's a violation of the law but yet

11    you never complained?

12    A.    I never knew it was a violation of the law and I have

13    utilized the policies but not during Mr. Spell's time here.

14    Q.    Any particular reason why not?

15    A.    No.

16    Q.    Have you taken any EEO-related training regarding

17    prevention of discrimination and harassment in the workplace?

18    A.    Yes.  I believe it's annually.

19    Q.    Okay.  So you've taken it every year?

20    A.    If it was offered and Mr. Spell allowed it, then yes.

21    Q.    Okay.  Well, I'm asking you.  Have you taken it?

22    A.    I have to look at my record.  I believe I've taken all

23    of them.

24    Q.    Okay.  So is it your testimony that you believe you've

25    taken EEO training each year which involved discrimination and

1    harassment?

2         A.    Yes.

3         Q.    Okay.  During that training do you recall them saying

4    what to do in an event that you are -- felt that you were

5    discriminated against or subjected to a hostile work

6    environment?

7         A.    Not specifically.  As with any policy, if something

8    comes up I look it up.

9         Q.    And you indicate -- and I'm not going to continue to

10   beat a dead horse.  I don't want to do that.  But you indicated

11   since 2007 until Mr. Spell's retirement you've been subjected to

12   that hostile work environment and harassment.  You've also

13   indicated that during that entire time you never complained.

14   You've --

15        A.    Beyond Mr. Spell.

16        Q.    Beyond Mr. Spell.  You've also indicated that you've

17   taken EEO-related training and that you also are aware of the

18   harassment policies but you never took any action.  Is that your

19   testimony?

20        A.    Not beyond Mr. Spell.

21        Q.    Okay.  I want to move on and ask you a few questions

22   regarding your specific --

23        A.    So I'm sorry to interrupt.  So this is the actual

24   testimony so all these people are supposed to be in here?  Not

25   according to --

1    Q.   I'm allowing them to be in here for right now.

2         I want to ask you a question about your first

3    claim.  On April the 14th, 2014 you received an e-mail from MAJ

4    Ivan Antosh, acting chief, orthopedic brace shop, that a

5    provider from California had been selected for the position of

6    Supervisory Orthotist/Prosthetic.  You allege that you were

7    subjected to a hostile work environment.

8    A.   Discriminated.

9    Q.   That you were subjected to a hostile work environment

10   on the basis of your national origin, which is discrimination.

11   Is that correct?  You allege on April the 14th, 2014 you

12   received an e-mail from MAJ Ivan Antosh; is that correct?

13   A.   Yes.

14   Q.   That a provider from California had been selected for

15   the position of Supervisory Orthotist/Prosthetic.

16   A.   Yes.

17   Q.   Could you explain how that affected your environment

18   or what that had to do with your national origin?

19   A.   I would like to actually take the opportunity to give

20   my opening statement that I thought was going to start this

21   before I answer that.

22   Q.   Okay.

23        THE INVESTIGATOR:  Let's go off the record for a

24   second.

25                    (Off the record.)

33

1          THE INVESTIGATOR:  We're back on the record.  We

2     were just taking a 10-minute break.

3          Q.   (BY THE INVESTIGATOR)  Mr. Alvarez, still directing

4     questions to you.  On April the 14th, 2014 you received an

5     e-mail from MAJ Ivan Antosh who was the acting chief that a

6     provider from California had been selected for the position of

7     Supervisory Orthotist/Prosthetic, GS-11.  You indicated that you

8     were subjected to a hostile work environment on the basis of

9     your national origin.  How does the notification from MAJ Antosh

10    factor into your national origin or present a hostile work

11    environment because you received the notice?

12         A.   The selectee was a Caucasian.

13         Q.   Okay.

14         A.   That's my answer.

15         Q.   Are you saying that that's discrimination because the

16    person happened to be of a different race?

17         A.   I'm just saying that's my answer.

18         Q.   Could you please be --

19         A.   Yes, yes.

20         Q.   -- a little bit more specific, sir?

21         A.   Yes.

22         Q.   Did you complain to anybody?

23         A.   I questioned it.

24         Q.   Did you complain to anybody regarding whether or not

25    you felt you were discriminated against?

34

1     A.   Not in those terms.

2     Q.   Could you explain what terms you did complain in and

3 who you complained to?

4     A.   It's on the e-mail so I can't -- I can't do that at

5 this time.

6     Q.   I'm sorry?

7     A.   Okay.  I don't understand the question, then, because

8 you're asking me something that --

9     Q.   This is your -- this is what you came in -- you

10 alleged these incidents.

11     A.   Okay.  I'm looking at more as what was actually, like,

12 on this question or whatever.  So that's not the question?

13     Q.   I'm sorry?

14     A.   That's not the question?

15     Q.   What's not the question?

16     A.   What I just asked you.  Okay.  Can you rephrase?

17     Q.   Sure.  No problem.  You say that you received an

18 e-mail from MAJ Antosh on somebody was selected from California.

19 You indicated they were Caucasian.  My question is, how did that

20 make your environment hostile?

21     A.   It showed that -- it's hard to answer that question

22 because it was after the manipulation and prevention of me to

23 apply to that position before that e-mail.  And then once I

24 received that e-mail, it confirmed what was happening before,

25 which happened in the hostile environment.

1      Q.   How was -- how was MAJ Antosh sending you an e-mail a

2  factor against your national origin?

3      A.   It confirmed -- can we go off the record?

4      Q.   No.

5      A.   It confirmed the manipulation and the actions that

6  Mr. Cruz took to prevent me from applying for the position.  And

7  when the e-mail got here I still had to work with these people

8  and they're still involved in my actions and they're still

9  involved, and that's my answer.

10     Q.   Do you understand the question?

11     A.   I'm not sure.

12     Q.   Did you complain to anybody that you were

13  discriminated against because a white employee was hired or

14  selected?

15     A.   Not until these proceedings or actions that involved

16  the EEO.

17     Q.   Did you complain to MAJ Antosh that you were being

18  subjected to a hostile work environment because a white employee

19  was being hired?

20     A.   No.

21     Q.   Do you know anything about the background of the

22  person?  Who was the person, first of all, that was hired, their

23  full name?

24     A.   I don't know.

25     Q.   So how did you know the person was Caucasian?

1      A.    I don't know.

2      Q.    That's your testimony that you don't know if they were

3   Caucasian?

4      A.    Last name being Christianson.

5      Q.    So you're assuming that because his last name is

6   Christianson that he's Caucasian?

7      A.    At this point, yes.

8      Q.    Do you know anything about Mr. Christianson's

9   background?

10     A.    No.

11     Q.    Do you know anything about his experience, education?

12     A.    No.   That wasn't furnished in the document request.

13              THE INVESTIGATOR:  Let's go off the record.

14                      (Off the record.)

15              THE INVESTIGATOR:  All right.  We're back on the

16   record.  We were just getting some explanation regarding the

17   claims that were accepted.

18     Q.    (BY THE INVESTIGATOR)  Mr. Alvarez, again, is it your

19   testimony that you did not know Mr. Christianson?

20     A.    I do not know Mr. Christianson.

21     Q.    Okay.  Is it your testimony that you do not have

22   first-hand knowledge of his national origin?

23     A.    That is correct.

24     Q.    Is it your testimony that you have no knowledge of his

25   background, experience or education?

USA-Alvarez-001876

1    A.   That is correct.

2    Q.   On March the 7th, 2014 you indicate that you were

3  intentionally misled by Mr. Valentin Cruz, supervisory health

4  systems specialist, concerning the announcement of the position

5  of supervisory orthotist/prosthetist.  You indicate that

6  Mr. Cruz allegedly said he was working on the position

7  description for the announcement when it had already been

8  announced and closed on March the 6th, 2014.  The hostile work

9  environment continued from 2007 to the present.  I'm a little

10  lost on this so I'm going to break this down.  When you say on

11  March 7th you were intentionally misled by Mr. Valentin Cruz,

12  who is Mr. Cruz in your chain of command?

13    A.   At this point it's not official what he is because I

14  have not --

15    Q.   During the time of your filing these complaints and

16  during the time of these incidents what was Mr. Cruz to you?

17    A.   He was an administrator for the department.

18    Q.   Okay.  Was he over you in any way, second, third-line

19  supervisor?

20    A.   Not at that time as far as I know.

21    Q.   Okay.  You indicate that Mr. Cruz misled you.  What is

22  Mr. Cruz's national origin?

23    A.   I'm not sure.

24    Q.   You indicate that you were subjected to a hostile work

25  environment on the basis again of your national origin.  What do

1    you believe Mr. Cruz's national origin to be?

2        A.   I'm not sure.  If I were to guess I would say it would

3    be Hispanic.  Never discussed it.

4        Q.   And it is your testimony that you never discussed it

5    with Mr. Christianson as well?

6        A.   That's correct.

7        Q.   Why do you say that Mr. Cruz misled you --

8    intentionally misled you concerning the announcement of the

9    position?

10       A.   The slide of the department chief meeting for March

11   indicated that the supervisor position for the brace shop would

12   open on the 7th of March.  The incident that I'm referring to --

13   when, in fact, that actually closed on the 6th.  The incident

14   I'm referring to, he shows up on the 7th of March.

15       Q.   Who is he?

16       A.   Mr. Cruz.  Made it known he was there.  I was working.

17   Him and Mr. Perez were the front.  Donna was off that day or at

18   least that afternoon when he was there.  And they got my

19   attention.  First Mr. Perez comes out, mentions something about

20   the position and certification, et cetera.  So then Mr. Cruz

21   tells me that he's been assigned or tasked to --

22       Q.   Who is he?

23       A.   Mr. Cruz.

24       Q.   Okay.

25       A.   He had been assigned to write up the job description

1  for the supervisory position that was open.  And made that same

2  comment, certification, et cetera, when in fact the position had

3  closed and they already had offered the position.

4      Q.   Okay.  Mr. Cruz made the comment to who?

5      A.   Me.

6      Q.   To you.

7      A.   In front of Mr. Perez.

8      Q.   Okay.  So he made that comment and --

9      A.   That he was tasked.  And then because of the slide

10  that said that the position was going to open on the 7th -- of

11  course I looked that day.  It wasn't there.  But then he says,

12  okay, I'm working on it.  That to me is intent.

13      Q.   How was your national origin a factor?

14      A.   It all boils back down to who I am.  That's who I am.

15  And it is not unheard of for a Hispanic to discriminate against

16  another one.  It's very common.

17      Q.   Okay.  And do you believe Mr. Cruz was intentionally

18  trying to discriminate against you because you're Hispanic?

19      A.   Yes.

20      Q.   Is it your testimony that you believe Mr. Cruz to be

21  Hispanic by sight?

22      A.   Yes.

23      Q.   Why do you believe that he was intentionally trying to

24  discriminate against you when he informed you about the

25  position?

1    A.   Because of his actions.

2    Q.   Could you be more specific?

3    A.   As explained before, it was obvious the position

4    already had been filled and he's over here like it's not.

5    Q.   Okay.  Did you question Mr. Cruz about that?

6    A.   What I did at that time, I got on the Internet, went

7    to USA jobs and I printed out a couple of job descriptions for

8    an orthotist position that was an 11, one that was

9    non-supervisory and one that wasn't.  And the document is dated.

10   And on my defense I handed it to him to assist him on that since

11   he was bringing it up.  And that was the action that I took.

12   Q.   What do you mean when you say you handed that to him

13   to assist him?

14   A.   Well, he said he was tasked to write the description

15   of the position.  So I just went in to show him that what he was

16   insinuating about certification, if he did that he would be the

17   only one.

18   Q.   If he did that?

19   A.   Write that into the description.

20   Q.   Write what into the description?

21   A.   That certification was required.  But ultimately it

22   wasn't on the next one.

23   Q.   Okay.  So was there a problem after you discussed that

24   with him?  How did the conversation end?

25   A.   That was it.  When I handed that to him I went back to

 1  work.

 2      Q.    Was he hostile to you in any way, Mr. Cruz?

 3      A.    By his actions, that's hostile to me for him to be

 4  there telling me he's working on the job description that's

 5  already been filled.  But other than that, I went back to work.

 6  So nothing else was said between us.

 7      Q.    What is your -- you said you've had EEO training on

 8  hostile work environment and discrimination over several years.

 9  You say that you've had training in EEO -- EEO training.  Can

10  you tell me what is your definition of a hostile work

11  environment.

12      A.    Any actions that are just towards an individual that

13  makes them feel uncomfortable is the simplest explanation to me.

14      Q.    You indicate on June 17th, 2013 Ms. Amarilis

15  Diaz-Rosario De Santiago, A-m-a-r-i-l-i-s, Diaz-Rosario is

16  hyphenated, D-i-a-z, hyphen, R-o-s-a-r-i-o, De, D-e, Santiago,

17  S-a-n-t-i-a-g-o, who was the secretary to COL Gregory Weaver,

18  chief, Department of Orthopedic and Rehabilitative Services,

19  sent an e-mail to the entire division stating that MAJ Antosh

20  would be the acting chief, orthopedic brace shop.  I didn't call

21  Ms. De Santiago to this proceeding.  I did want to ask you why

22  are you saying because she sent you an e-mail -- or excuse me --

23  she sent the e-mail to the entire division.  How was that

24  hostile to you when an e-mail was sent to the entire division?

25      A.    It was hostile to me because previous to that COL

1   Weaver had appointed me the chief of the brace shop.

2        Q.   Did you complain to somebody?

3        A.   I talked to COL Weaver, sent him an e-mail.  He said

4   we'll get together.

5        Q.   Do you know when you sent that e-mail?

6        A.   Okay.  I came in -- the e-mail actually that I'm

7   referring to was before the 17th.

8        Q.   Okay.

9        A.   Because COL Weaver rescinded and removed me from

10   acting chief of the brace shop.  He did it on the 24th and --

11       Q.   24th of?

12       A.   Of May.  I'm sorry.

13            MS. ALVAREZ:   2013.

14       A.   And it was to all.  Mr. Alvarez will be the chief of

15   the brace shop until further notice.

16       Q.   (BY THE INVESTIGATOR)  Okay.  So again, it's your

17   testimony the e-mail did not just go to you, it went to

18   everybody?

19       A.   The list is the whole page almost of who they sent it

20   to.

21       Q.   And it's your testimony that that created a hostile

22   work environment for you?

23       A.   Yes, because it came after the department was told

24   that I was going to be chief and then this told the department

25   I'm not going to be the chief.

1    Q.   Who told you that you were going to be the chief?

2    A.   COL Weaver.  Didn't tell me.  He told, again, the

3    whole -- all.  The way he stated all, Mr. Alvarez will be -- and

4    throughout the e-mail.

5    Q.   Okay.  Okay.  So when he, I guess, changed his mind or

6    something came up or it changed, did you talk to COL Weaver

7    about his change?

8    A.   Of course.  Of course, yes.

9    Q.   And why he changed?

10   A.   Requested.  Ultimately he said in front of MAJ

11   Gloystein and myself -- now, the first e-mail of his response of

12   me questioning him about it, because I was on leave on the 25th

13   and 26th because I knew Mr. Spell was leaving so I was going to

14   take some days off and start the new year off.  When those two

15   days that I was off Mr. Spell came in, talked to Weaver -- COL

16   Weaver and now LTC Gloystein and the decision was made by COL

17   Weaver to remove me from that position.  He left two documents

18   on my desk -- I was on leave -- stating to the effect new policy

19   change.  I'm demoting you back down.  I'm putting Mr. Perez --

20   in a sense promoting him to a provider status and this has been

21   verbally approved -- verbally approved by MAJ Gloystein and COL

22   Weaver dated the 9th of May.

23          MS. ALVAREZ:   2013.

24   Q.   (BY THE INVESTIGATOR)  And did you complain to MAJ --

25   COL Weaver that you felt this was discriminatory because of your

1  national origin?

2      A.   When -- yes.

3      Q.   When did you complain to him?

4      A.   That same day.  When I came back I found -- I came

5  back on a Friday.  That's when I found these on my desk.  I came

6  in to do my what we call time sheets or time cards because I

7  hadn't previously done that and that's when I found these

8  documents.  So I immediately e-mailed him, told him we need to

9  talk.  And I expressed to him -- this was telephonically -- that

10  why is he removing me first from the position and why is he

11  putting MAJ Antosh in this position when MAJ Antosh is less

12  qualified to run a brace shop technically with everything

13  involved, questions that need be asked, things that need to be

14  done, et cetera, and he's away from the hospital.  And I did

15  mention that he's Caucasian and that was the extent of that.

16      Q.   You mentioned this to who?

17      A.   To COL Weaver over the phone.

18      Q.   And what is COL Weaver's race or national origin?

19      A.   He's Caucasian.

20      Q.   And what was COL Weaver's response to that?

21      A.   He said well -- nothing at that point.  He had to go.

22  But me did send me an e-mail that stated something to the effect

23  of some changes had to be made.  He had already made the change

24  to put me in the position, but some changes had to be made in

25  lieu of Mr. Spell leaving.  Hopefully the weekend will mend you

1  or something to that effect.  And then we ultimately had a

2  meeting with him and Gloystein where he further elaborated that,

3  and I quote, I had to take the outgoing professional,

4  Mr. Spell's recommendation.

5       Q.   Did COL Weaver ever comment to you when you say that

6  you made the comment to him that MAJ Antosh was getting the

7  position because of his national origin?

8       A.   No.  That wasn't all I said, but no to that.

9       Q.   Okay.  So he never responded to your comment?

10      A.   No.

11      Q.   On May 31st, 2013 you indicate that COL Weaver sent an

12  e-mail questioning why Mr. Spell, the previous chief orthopedic

13  brace shop supervisor, was making policy when for all intents

14  and purposes he was no longer working.  What are you getting at

15  with this incident here?

16      A.   That COL Weaver made the mistake of taking Mr. Spell's

17  word for whatever he said that ultimately he changed his

18  decision.  And Mr. Spell, as I mentioned, is a racist and he is

19  a racist against Hispanics.

20      Q.   What --

21      A.   And that -- go ahead.

22      Q.   No, I'm sorry.

23      A.   And that -- that was his goal.  That was his goal.

24      Q.   What policy was Mr. Spell making?

25      A.   I have -- I have those documents.  One in there states

1  both providers will do equal work, things to that effect.

2      Q.    Okay.  And how was that policy discriminating to you?

3      A.    Well, the question to that was why, as far as

4  Mr. Spell being there when he was -- why is he making policy.

5  I'm sorry, what was the question?

6      Q.    Why was Mr. Spell -- his making policy discriminatory

7  to you?

8      A.    Because he -- Number 2, Mr. Alvarez and Mr. Perez will

9  equally see scheduled and walk-in patients and review consults

10  and annotate encounters is one of them.

11     Q.    Okay.  How is that discrimination with regards -- how

12  is your national origin a factor in that?

13     A.    Because Mr. Spell -- it was just the result of

14  Mr. Spell's discriminating against me.

15     Q.    I'm sorry?

16     A.    So it's an action that followed.  It's an action that

17  followed.  And how it occurred is because he discriminates

18  against Hispanics.  It was his recommendation, his movements and

19  COL Weaver's accepting it that this e-mail occurred and because

20  of my national origin of Hispanic.

21     Q.    With him making this policy, how was this -- how was

22  the environment made hostile?

23     A.    Ms. Bowling can probably answer that a lot more better

24  than I can, however, it created such a hostile environment that

25  putting this young man in that position, which was policy, I

1  rejected and said he's not an orthotist.  Because there was

2  e-mails back and forth about this from the schedulers and that

3  whole office.  What's his credentials, is he an orthotist.  I

4  mean, just back and forth, back and forth, back and forth.  My

5  response was I do not want him on the schedule at that time.

6  That was when I was still officially the chief.  And it was

7  overwritten.

8      Q.   You did not want who on the --

9      A.   Mr. Perez.  Because I knew that he wasn't qualified.

10     Q.   So are you comparing yourself to Mr. Perez?

11     A.   I'm comparing that, yes, he was put in the same

12  category as I was.

13     Q.   Okay.  So how are you comparing yourself to Mr. Perez?

14     A.   Comparing myself?

15     Q.   Uh-huh.  You're saying he was treated differently than

16  you were?

17     A.   Yes.

18     Q.   And are you saying that's because he's Hispanic?

19     A.   Yes.

20     Q.   So you're saying that he was treated differently than

21  you because he's Hispanic and you're Hispanic?

22     A.   That's my allegation.

23     Q.   Why do you say that?

24     A.   Because he's Hispanic.

25     Q.   Well, what evidence do you have?

USA-Alvarez-001887

 1       A.   They put him in a position he wasn't supposed to be

 2   in.   That's favorable action.

 3       Q.   Okay.   But what evidence do you have because he's

 4   Hispanic?

 5       A.   Because he is.

 6       Q.   So you're saying he was placed in that position

 7   because he's Hispanic?

 8       A.   He was placed in the position for whatever reason that

 9   they did it, but he's Hispanic.

10       Q.   So is it your testimony you don't know the reasons why

11   they placed him in that position?

12       A.   Besides Spell manipulating it, that's correct.

13       Q.   Okay.   So is it your testimony that you don't know if

14   his race --

15       A.   No.

16       Q.   -- if his national origin was a factor or not?

17       A.   No, I do not.

18       Q.   On May 29th, 2013 after Mr. Spell found out that you

19   had been named the acting chief, Mr. Spell allegedly placed a

20   typewritten note, no heading, no signature, dated May 29th, 2013

21   on the Complainant's desk, subject, temporary operation policy

22   and guidance for the orthopedic brace clinic, placing the

23   Complainant and a coworker, Mr. Matthew Perez, orthotist, on

24   equal duties in the orthopedic brace shop.   I assume we're

25   talking about the same thing here?

1       A.   Yes.

2       Q.   But now this is saying you're on equal duties?

3       A.   Yes, yes.

4       Q.   So he wasn't over you or anything like that?

5       A.   No.

6       Q.   So --

7       A.   But on the job descriptions -- and I noticed that it

8   wasn't said on the document request of the 7th.  On the 7th

9   there is a block in there that says that if, in this case

10  Mr. Perez, since he was that job description from this Fort Hood

11  for the orthotist GS-7 -- states that if he is to see a patient

12  or fit a patient then someone, which would have to be me of a

13  higher rank -- he shouldn't even have been fitting a patient

14  unless I was present.

15      Q.   So again, are you saying that Mr. Perez is being

16  treated differently than you?

17      A.   Yes.

18      Q.   Are you saying Mr. Perez is being treated differently

19  than you because he's Hispanic?

20      A.   More favorably, but I cannot -- I cannot testify to

21  that.

22      Q.   How did this create a hostile work environment for

23  you?

24      A.   He wasn't supposed to be there and it actually -- he

25  was already a problem and by putting him there his actions and

1  mannerisms just excelled.  And so to put it simply, my allege is

2  that he treats people bad and now that he was put in that

3  position and there was not going to be an in-house person

4  present just accelerated his mannerism more to be even worse

5  than what he had been doing.  Because when Mr. Spell was there

6  at least he controlled him.

7      Q.   Okay.  But you say Mr. Spell put him in that position;

8  is that correct?

9      A.   Yes.  Well, COL Weaver and MAJ Antosh, they always

10  have the ultimate decision.  He influenced that decision.

11      Q.   Who influenced that decision?

12      A.   Mr. Spell.  And it says it on here.

13      Q.   But I need your testimony.  How did he influence and

14  what evidence do you have that he was influenced?

15      A.   This.  This is temporary operational policy and

16  guidelines has been verbally approved by LTC Gloystein and COL

17  Weaver.

18      Q.   Did you specifically go back to them and ask COL

19  Weaver were they influenced in any way by Mr. Spell?

20      A.   Well, I didn't have to.  He told me in the meeting

21  that he had to take Mr. Spell's word.

22      Q.   Okay.

23      A.   Or recommendation.  Excuse me.

24      Q.   I'm going to move on.  You indicate here that although

25  Mr. Spell's effective retirement date was August 31st, 2013 he

1    was out of the office most of the time from May 2013 until he

2    retired.  On May 24th, 2013 COL Weaver sent an e-mail stating

3    you would be the acting chief orthopedic brace shop effective

4    June 3rd, 2013 until further notice.  What is your response here

5    how this relates to your national origin?

6         A.    That doesn't.  Where it relates to is for him removing

7    me from that and putting a less qualified Caucasian in there in

8    place of me.

9         Q.    You said a less qualified Caucasian?

10        A.    Yes.

11        Q.    And that was who?

12        A.    MAJ Antosh.

13        Q.    Now, what is -- well, you just said.  MAJ Antosh's

14   position and title was different from yours; is that right?

15        A.    Orthopedic surgeon.

16        Q.    So are you comparing yourself to MAJ Antosh?

17        A.    What I'm saying is he was put in that position.  He

18   was less qualified as the job description requires for an

19   orthopedic brace shop supervisor and he's Caucasian.

20        Q.    You allege that Mr. Spell intentionally slandered and

21   defamed you to your chain of command so that they would not

22   consider you for the supervisory position because of his hatred

23   for Hispanics; is that correct?

24        A.    That is correct.

25        Q.    What was the slander that Mr. Spell made?

1          A.   I wasn't present.

2          Q.   So what evidence do you have that he slandered and

3    defamed your name or you?

4          A.   The fact that I was removed from the position.

5          Q.   Okay.  It's a fact that you were removed, but what

6    evidence do you have that he said something negative about you?

7    What evidence do you have?

8          A.   I do not.

9          Q.   You indicate that Mr. Spell allegedly told you several

10   times since you came to Fort Hood in 2007 that he hated you,

11   wished you had never come to work here.  You indicated that

12   Mr. Spell allegedly hated that he had no part in your employment

13   at Fort Hood --

14         A.   That is correct.

15         Q.   -- that he was a priority placement program employee

16   after his position at Fort Sill was abolished.  Now, obviously

17   he is retired and moved on.  He's not here to defend himself.

18   Did you complain about Mr. Spell at that time?

19         A.   I've always had faith but no.  I've always had faith.

20         Q.   Okay.  Thank you.  Your testimony is that you did not

21   complain to any management official?

22         A.   That is correct.

23         Q.   Mr. Perez you indicated began documenting your time

24   and was removed from provider status and that doubled your

25   patient load after you initiated contact with the Fort Hood EEO

USA-Alvarez-001892

53

1   office on May 15th.

2        A.   That's the way it was accepted.

3        Q.   Could you explain that a little bit better?

4        A.   My original allegement was after going through the EEO

5   because that's when it started -- I mean, I'm sorry, to the

6   union.

7        Q.   Okay.  That's when what started?

8        A.   The timekeeping.

9        Q.   You say Mr. Perez was timekeeping?

10        A.   Yes.

11        Q.   Okay.  And was that his role, to keep time?

12        A.   As I understand it, MAJ Antosh apparently was made

13   aware of it and it stopped.  So no, it was not his role.  I

14   believe that's what happened, but I'm not sure.

15        Q.   Did you complain to anybody?

16        A.   I don't remember.

17        Q.   How did this double your time when Mr. Perez started

18   documenting your --

19        A.   What it was is there was two people seeing patients.

20   Now there is one with the same work load.  So I actually didn't

21   write it.  I didn't write it that way but it was accepted that

22   way.  So if there is two people seeing patients and one is

23   removed, the patients don't go away, just that one person.  And

24   as a result of that at that time I was allowed time to do all

25   these other extra duties and include the encounters.

54

1      Q.    Who was removed from provider status?

2      A.    Matthew Perez.

3      Q.    Mr. Perez was.  Okay.  And you're saying that that's

4   what doubled your patient load?

5      A.    That's what was accepted.  I don't think technically

6   it doubled it.  But the patients that he was going to see -- it

7   did definitely increase it, but I would not testify it doubled

8   it.  But I do know that somebody had to see them.

9      Q.    Who removed him?

10     A.    I'm not sure.  I would imagine -- okay.  And here's

11  the thing.  When things like this happen I'm never informed.  I

12  found out through Ms. Bowling from an e-mail that MAJ Antosh

13  sent her.  That's how I found out.

14     Q.    That Mr. Perez was removed?

15     A.    Yes.  He sent an e-mail to Ms. Bowling stating

16  Mr. Perez is not to make any patient contact from now on thus

17  removing him.

18     Q.    Okay.  And after he was removed, how was that a factor

19  to your national origin?

20     A.    I believe because of that action that my environment

21  and my treatment is an example of it.  That's my answer.

22     Q.    Could you be a little clearer?  I don't understand.

23     A.    Okay.  Ask me -- ask the question.

24     Q.    Okay.  You said Mr. Perez was removed.  How did that

25  have an effect on your national origin when Mr. Perez was

1  removed?

2      A.   Have an effect on my national origin?

3      Q.   Yeah.  Your whole case again is that you've been

4  discriminated against because of your national origin.  You were

5  subjected to a hostile work environment because of your national

6  origin.  And you're saying in F here you indicated Mr. Perez

7  began documenting.

8      A.   Okay.  Because MAJ Antosh is a Caucasian and he

9  initiated that action that ultimately did result in a hostile

10 environment.

11     Q.   MAJ Antosh initiated what action?

12     A.   To remove Mr. Perez from the position.

13     Q.   Are you saying MAJ Antosh removed him in order to

14 discriminate against you?

15     A.   I cannot answer that.

16     Q.   Are you saying that MAJ Antosh removed him in an

17 effort to create a hostile work environment?

18     A.   My answer is going to have to be that ultimately that

19 would have to be decided by a higher judge.

20     Q.   Well, I need to know.

21     A.   I don't know.  I cannot prove that.

22     Q.   Okay.  That's your answer.  On September 11th, 2014

23 you amended your complaint by adding non-selection based on

24 national origin, Hispanic, and reprisal when you discovered on

25 or about September the 8th, 2014 that you had not been selected

1  for the position of Supervisory Orthotist/Prosthetist after it

2  was re-announced on July the 1st, 2014.  How do you believe that

3  you were discriminated against?

4      A.   I was one of the top two on the list.  I did not

5  receive an interview, I was not offered the position and one of

6  the conditions that I saw was that the hire was going to be

7  based on experience.  And the person that they hired, which

8  happened to be Hispanic, his experience as supervising I don't

9  even believe -- there might have been one, I'm not sure, whereas

10 mine I actually said I supervised, I supervised, I supervised

11 and his wordings were I oversaw.  And if the position was going

12 to be filled by experience alone, and it says that on the --

13 then I felt I was discriminated against even though this man is

14 of Hispanic origin.

15     Q.   Okay.  Please explain for the record why you feel your

16 race was a factor when another Hispanic was selected?

17     A.   At this point I cannot.

18     Q.   Do you know the person that was selected?

19     A.   I do not.

20     Q.   Do you know what their national origin is, the person

21 that was selected?

22     A.   I have an idea because of his last name Perez.

23     Q.   Is it your testimony that because a person has a

24 certain last name that identifies the person's national origin?

25     A.   No.  But I answered the previous question differently.

1   If you were to ask me that --

2       Q.   Well, you indicated that Mr. Christianson that you

3   assumed that he's Caucasian because of his last name.

4       A.   But I also retracted and said that I don't know for

5   sure.

6       Q.   Okay.  How did this last incident make your

7   environment hostile when you were not selected for the position?

8       A.   My environment hostile -- it really couldn't get any

9   more hostile than what it is so it was the same.

10      Q.   Okay.  So --

11      A.   So far.

12      Q.   Okay.  All right.  I'm going to defer to CPT Jones.

13              THE INVESTIGATOR:  CPT Jones, would you like to

14  question Mr. Alvarez?

15              CPT JONES:  Yes, sir.  May I have just one

16  moment?

17              THE INVESTIGATOR:  Sure.

18              CPT JONES:  Sir, the Agency does not have any

19  questions.

20              THE INVESTIGATOR:  Okay.  Let the record reflect

21  that at this time the Agency has no questions for Mr. Alvarez.

22              Ms. Alvarez, would you like to question your

23  husband?

24              MS. ALVAREZ:  No.

25              THE INVESTIGATOR:  Okay.  Let the record reflect

1  also that Ms. Alvarez, who was representing her husband,

2  indicates that she also does not have any questions for her

3  husband.  Okay.  At this time I'm going to excuse everybody

4  except for MAJ Antosh.  We'll take a five-minute break.

5                         (Off the record.)

6                  THE INVESTIGATOR:  We're back on the record.  We

7  were just taking a five-minute break.  We now have MAJ Antosh.

8                    MAJ IVAN ANTOSH,

9  having been previously sworn, testified as follows:

10                      EXAMINATION

11  BY THE INVESTIGATOR:

12      Q.    MAJ Antosh, for the record, could you please state

13  your full name as well as your title and your grade?

14      A.    Ivan J. Antosh.  I am the officer in charge of the

15  brace shop, chief of the brace shop.  My grade is major.

16      Q.    Okay.  Thank you.  And is that the Army?

17      A.    Yes.

18      Q.    How long have you been assigned to your position?

19      A.    As the chief of the brace shop since roughly end of

20  June of 2013.

21      Q.    Can you identify your organization that you were

22  assigned to during the period at issue and that period is going

23  to be the period that we're referring to from April -- excuse

24  me.  I'm sorry.  During the time of this EEO complaint.

25      A.    The organization is Darnell Army Medical Center.  I am

1    part of the Department of Orthopedic & Rehabilitation.

2         Q.    And you've been assigned to them for how long?

3         A.    As this position?

4         Q.    Yes.

5         A.    As this position since about the end of June of 2013.

6         Q.    Okay.  Do you know the Complainant?

7         A.    Yes, sir.

8         Q.    And how do you know him?

9         A.    He is one of the staff members in the orthotist brace

10   shop.

11        Q.    Okay.  When did you first meet the Complainant?

12        A.    Roughly the time that I took over as the OIC, as the

13   officer in charge.

14        Q.    And that was again?

15        A.    End of June 2013.

16        Q.    Okay.  Thank you.  Can you provide the name of your

17   first-level supervisor as well as their title?

18        A.    At this time or at that time?

19        Q.    During that time.

20        A.    During that time the chief of the department of

21   orthopedists was COL Greg Weaver.

22        Q.    Are you saying Weaver?

23        A.    Gregory Weaver.

24        Q.    And what was his grade and title?

25        A.    Colonel, 06.  He was the chief of the Department of

1    Orthopedics & Rehabilitation.

2         Q.   And your second-line supervisor?

3         A.   Above him at that time I don't recall.  It's changed

4    several times since then.

5         Q.   Okay.  I didn't ask.  Could you please for the record

6    state what your national origin is?

7         A.   Caucasian.

8         Q.   Okay.  Are you aware of the Complainant's national

9    origin?

10        A.   Yes.

11        Q.   And are you aware of his national origin by sight or

12   did he tell you?

13        A.   By sight.

14        Q.   Okay.  Thank you.  When did you first become aware of

15   his national origin?  When you met him?

16        A.   When I met him.

17        Q.   And that was when?

18        A.   Roughly June of 2013.

19        Q.   All right.  MAJ Antosh, the claims that we have here

20   before us indicates that the Complainant states that he was

21   subjected to a hostile work environment on the basis of his

22   national origin, Hispanic, when on April -- and discriminated

23   against on the basis of his national origin when on April the

24   14th he received an e-mail from you indicating that a provider

25   from California had been selected for the position of the

USA-Alvarez-001900

1    Supervisory Orthotist/Prosthetic position.  First of all, was

2    there a panel for this position?

3         A.   In terms of who reviewed the applications and

4    performed interviews?

5         Q.   Yes.

6         A.   The panel was myself and Mr. Cruz.

7         Q.   So basically this was more or less looking at resumes?

8         A.   Correct.

9         Q.   So there really wasn't a panel?

10        A.   Correct.

11        Q.   Were there any interviews?

12        A.   We interviewed that individual over the phone.

13        Q.   So again, it was basically just from looking at

14   resumes and making a selection from the resumes?

15        A.   Yes.

16        Q.   Okay.  Did you compare him to anybody else?

17        A.   That was the only application we received as that

18   applicant pool at that time.

19        Q.   Okay.  And do you know why that was?  Was he the only

20   one qualified?

21        A.   That was -- I don't know why that was, no.  I don't

22   have a good answer for that.

23        Q.   Who was that person that was selected?

24        A.   His name was Eric Christianson.

25        Q.   Is Eric currently working now?

1      A.   Not at our facility.

2      Q.   Okay.  So did he ever accept this job?

3      A.   He accepted the position, however, as the negotiations

4  went forward there was some sort of sticking point.  I'm not

5  really aware of the details, but he didn't end up signing the

6  final contract.  So we did not hire that individual.

7      Q.   Who is in that position now?

8      A.   It's still unfilled.

9      Q.   So it's vacant?

10      A.   (Witness nods head.)

11      Q.   I'm going to run through these, but if you have no

12  first-hand knowledge you can just say so.  On March 7th, 2014

13  the Complainant states he was intentionally misled by Mr. Cruz

14  concerning the announcement of the position of the Supervisory

15  Orthotist/Prosthetist, GS-0667-11.  First of all, are we talking

16  about the same position that Mr. Christianson was interviewed

17  for?

18      A.   Yes.

19      Q.   Do you have any knowledge of Mr. Cruz trying to

20  mislead Mr. Alvarez as it relates to this announcement or to the

21  announcement?

22      A.   No.

23      Q.   Do you have any first-hand knowledge of this incident

24  at all?

25      A.   No.

1      Q.    On June 17th, 2013 the Complainant alleges that

2  Ms. Diaz-Rosario De Santiago, secretary to COL Weaver, sent an

3  e-mail to the entire division stating that MAJ Antosh would be

4  the acting chief, orthopedic brace shop.  Just briefly tell me,

5  what is -- what is that about?

6      A.    There was a change of leadership and responsibility at

7  that time so he was informing the department of who the new

8  personnel would be.  So it was a department-wide e-mail so I was

9  on the same e-mail chain.

10     Q.    Okay.  And he selected you because of what reason?

11 Any particular reason?

12     A.    I was essentially assigned to the role.  I'm one of

13 the more senior majors so I was basically the first in line to

14 get an additional responsibility, which is what this is for me.

15     Q.    Now, you've heard Mr. Alvarez's testimony as to you

16 not having the experience to perform in that particular area.

17 What is your response to that?

18     A.    I don't have orthotic credentials.  Army officers are

19 very commonly assigned into areas of leadership or

20 responsibility where they don't have expertise and that is the

21 case in this situation.  I think what they were looking for was

22 an outside individual to supervise the brace shop and so that's

23 why I was assigned.

24     Q.    Okay.  Did you ever receive complaints about

25 discrimination --

USA-Alvarez-001903

1      A.   No.

2      Q.   -- from Mr. Alvarez?

3      A.   No.

4      Q.   Did he ever complain to you about a hostile work

5  environment, that he was being subjected to a hostile work

6  environment?

7      A.   There was issues between him and Mr. Perez on a

8  personal level, but other than that, no.

9      Q.   So you're saying there was some personality conflicts

10 or they were having some altercations?

11     A.   Yes.

12     Q.   Just briefly give me just for example.

13     A.   There was a lot of you could call it he said/she said

14 kind of thing.  So my -- the area where I work is separate from

15 the area where they work so I'm not actually in the facility.

16     Q.   Okay.

17     A.   So I would get phone calls from one individual

18 describing some activity that the other individual had done or

19 some behavior that the other individual had performed and then

20 I'd get a follow-up kind of e-mail or phone call from the other

21 individual.  So there was a lot of back and forth.

22 Unfortunately I wasn't around to witness most of it so all I

23 really received was these phone calls or e-mails.

24     Q.   Did you intervene in any way at any time?

25     A.   We discussed -- we've discussed multiple times trying

1    to get along as a team and perform as a team and try to get the
2    job done.
3        Q.   When you discussed that -- when you say we?
4        A.   Collectively me, Mr. Alvarez and Mr. Perez.
5        Q.   Did y'all ever get together and have a meeting
6    together in your office or something like that?
7        A.   We've had several meetings both as a group and
8    separately.
9        Q.   Okay.  All right.  Was anything ever accomplished?
10       A.   The goal and the directive was team work and getting
11   along, especially in a small environment like the brace shop.
12   You know, stressing the importance of team work and helping your
13   teammates out, et cetera.
14       Q.   And what was the outcome?
15       A.   I would say that we reached a steady state after
16   Mr. Perez and Mr. Alvarez were on equal duties to where things
17   were functioning well and we were getting patients seen and
18   disposition.  That sort of changed once the level of
19   responsibility changed.  I think that was in May.
20       Q.   Whose idea was it to put them both on equal?
21       A.   That was made I think by COL Weaver and LTC Gloystein
22   so that was before I assumed my responsibility.
23       Q.   Okay.  On May 31st the Complainant states that COL
24   Weaver -- that he sent COL Weaver an e-mail questioning why
25   Mr. Spell was making policy when for all intents and purposes he

66

1    was no longer working there.  Are you familiar with this

2    incident?

3         A.   No.

4         Q.   Okay.  Thank you.  On May 29th after Mr. Spell found

5    out the Complainant had been named acting chief he allegedly

6    placed a typewritten note, no heading, no signature, dated May

7    29th, 2013 on the Complainant's desk, subject temporary

8    operation policy and guidance for the orthopedic brace clinic.

9    Do you have any first-hand knowledge about this?

10        A.   No.

11        Q.   Although Mr. James Spell's effective retirement date

12   was August 31st, 2013 he was out of the office most of the time

13   from May 2013 until he retired.  On May 24th COL Weaver sent an

14   e-mail stating Mr. Alvarez would be the acting chief of the

15   brace shop on June 3rd, 2013 until further notice.  Were you

16   aware of that?

17        A.   No.

18        Q.   The Complainant alleges Mr. Spell intentionally

19   slandered and defamed him to his chain of command so that they

20   would not consider him for the supervisory position because of

21   his hatred for Hispanics.  Has the Complainant ever complained

22   to you about Mr. Spell making any slanderous or defaming remarks

23   about him or Hispanics?

24        A.   No.

25        Q.   Have you and Mr. Spell ever spoke regarding --

USA-Alvarez-001906

 1      A.    I've never met Mr. Spell.

 2      Q.    Okay.   Thank you.   Mr. Perez began documenting the

 3  Complainant's time and was removed from provider status, thus

 4  doubling the Complainant's patient load after he initiated

 5  contact with the Fort Hood EEO office.   I'm sorry about the way

 6  these are framed here, but do you know anything about that

 7  incident, Mr. Perez began documenting Complainant's time?   Do

 8  you know anything about him --

 9      A.    So this was essentially repercussion of the fact that

10  there was interpersonal issues going on between them and one

11  person watching what the other one was doing and coming to me

12  with those issues.   So as a way of trying to quall (phonetic)

13  that --

14            THE INVESTIGATOR:   Excuse me.   Go off the record

15  for a second.

16                       (Off the record.)

17            THE INVESTIGATOR:   We're back on the record.   We

18  were getting a phone call -- conference call coming in.

19      Q.    (BY THE INVESTIGATOR)   MAJ Antosh, on September the

20  11th -- excuse me.   Go back to your documenting -- Mr. Perez was

21  documenting Mr. Alvarez's time and was removed from provider

22  status.   Can you explain what's going on there?

23      A.    Right.   So due to the -- again, due to the

24  interpersonal conflicts that were happening intermittently I

25  encouraged them both to basically keep a time log as a way of

1    avoiding any of these he said/she said kind of situations.  So I

2    think that's what the initial part of part F is referring to.

3         Q.   So are you saying Mr. Perez was documenting the

4    Complainant's time of, what, when he would show up for work,

5    leave work or something of that nature as it relates to the

6    time?

7         A.   Yes.

8         Q.   And was Mr. -- was the Complainant also doing the same

9    thing?

10        A.   I don't recall off the top of my head.  I know there

11   were a large number of e-mails and phone calls about what each

12   person was doing and that sort of thing so I don't have

13   specifics about that.

14        Q.   Okay.  The last thing I have here is on September

15   11th, 2014 the Complainant amended his complaint by adding a

16   non-selection based on his national origin and reprisal when he

17   discovered on or about September the 8th, 2014 he had not been

18   selected for the position, the Supervisory

19   Orthotist/Prosthetist, GS-0667-11, after it was re-announced on

20   July the 1st, 2014.  Do you have any knowledge of this -- what's

21   going on here?

22        A.   Yes.

23        Q.   Could you respond?

24        A.   So the second group of applicants that we received was

25   a total -- there was a total of four applicants.  Mr. Alvarez

1  was one of those.  The individual that we interviewed we felt

2  had better credentials, for lack of a better word, than any of

3  the other applicants.  That was the individual that we

4  interviewed and that was the individual we offered the position

5  to.

6     Q.   Has he started working yet?

7     A.   No.

8     Q.   Have you met him?

9     A.   Only over telephone interview.

10     Q.   Did he acknowledge what his national origin was to

11  you?

12     A.   No.

13     Q.   Do you have any knowledge of what his national origin

14  is, any evidence?

15     A.   No.

16     Q.   Okay.  Did the Complainant complain to you about this

17  second announcement, him not getting the position?

18     A.   He did send me some e-mails questioning why we made

19  that decision.  I didn't get into the specifics of that with

20  him.

21     Q.   Okay.  Did the Complainant make any comments that he

22  felt it was discriminatory?

23     A.   No.

24     Q.   Do you believe the Agency discriminated against

25  Mr. Alvarez because of his national origin?

1      A.    No.

2      Q.    Do you believe that they subjected him to a hostile

3  work environment because of his national origin?

4      A.    To my knowledge and experience, no.

5      Q.    Has he ever complained -- are you familiar with the

6  hostile work environment or harassment policies here?

7      A.    I know there are policies in place.

8      Q.    Do you know where they're posted at?

9      A.    Like he said, they are posted on the Website -- on the

10  hostile Website.  They're pretty accessible.

11      Q.    Have you gone through any EEO training yourself?

12      A.    The same as he has.  We do an annual or a bi-annual

13  training.

14      Q.    And at that training does EEO conduct it, somebody

15  from the EEO?

16      A.    It's a classroom kind of teaching setting.

17      Q.    Is it usually on harassment or discrimination in

18  general?

19      A.    Yes.

20      Q.    When you walk away from there do you feel like you've

21  gotten a pretty good sense of what discrimination is?

22      A.    Yes.

23              THE INVESTIGATOR:  I'm going to -- because of the

24  time I'm going to go ahead and defer to CPT Jones, if you would

25  like to question MAJ Antosh.

USA-Alvarez-001910

1          CPT JONES:  Sir, the Agency does not have any
2    questions for MAJ Antosh.  Thank you.
3          THE INVESTIGATOR:  Ms. Alvarez, do you have any
4    questions of MAJ Antosh?
5          MS. ALVAREZ:  No, thank you.
6          THE INVESTIGATOR:  Thank you, sir.  Do you have
7    anything else -- hold on one second.  You've had a chance to
8    hear Mr. Alvarez's testimony.  Do you care to comment on
9    anything that he said here today?
10         MAJ ANTOSH:  I don't have anything to add, I
11   don't think, no.
12         THE INVESTIGATOR:  Hold on one second.
13   Mr. Alvarez, do you have a rebuttal of anything that MAJ Antosh
14   has said?
15         THE COMPLAINANT:  Not that I want to bring in.  I
16   do want to make a statement in his actual defense.  He was a
17   pawn that just got thrown into something, this situation, and
18   wasn't really aware.  To me he just got caught up in it and I
19   never -- remember I sent him an e-mail stating that -- letting
20   him know that there is an EEO complaint going.  He is named on
21   there but that I personally do not have any complaints against
22   him.
23         THE INVESTIGATOR:  Do you believe he
24   discriminated against you?
25         THE COMPLAINANT:  I do not.

1          THE INVESTIGATOR:  Do you believe that MAJ Antosh

2    subjected you to a hostile work environment?

3          THE COMPLAINANT:  Yes.

4          THE INVESTIGATOR:  And why do you believe that?

5          THE COMPLAINANT:  You know, the questions there

6    are kind of broad, but there is no way that he can control

7    what's actually happening there.  So in that sense that's how.

8    I know it's a broad question.

9          THE INVESTIGATOR:  You say you have no complaints

10   against MAJ Antosh.

11         THE COMPLAINANT:  No, but you asked me a

12   different question.

13         THE INVESTIGATOR:  Let me ask you a second one.

14   How did MAJ Antosh contribute to a hostile work environment?

15         THE COMPLAINANT:  By not addressing issues as

16   they come and as mentioned before, it's -- no actions.

17   Regardless of who is doing or anything of that nature, there was

18   just not enough input, not enough back-and-forth information to

19   getting down to the truth.  That's what he's -- and that he as I

20   believe put so much confidence on Mr. Cruz and that's where I

21   think he faulted trust.

22         THE INVESTIGATOR:  You heard MAJ Antosh state

23   that he had meetings with y'all.  Do you agree with that?

24         THE COMPLAINANT:  Not in regard -- the question

25   was in regard to behavioral issues or not getting along.  No, I

1    don't agree with that.  He did come in for templates and things

2    of that nature.  And as far as we both were supposed to keep

3    each other's time, first time I heard.

4                    THE INVESTIGATOR:  So you're saying -- it's your

5    testimony that he did not try to talk to you guys together or

6    separate and try to take care of the problem?

7                    THE COMPLAINANT:  Of the time logging?

8                    THE INVESTIGATOR:  Of anything.  Of any

9    disagreement that you-all may have had, did he try to intervene?

10                   THE COMPLAINANT:  I don't know because I never

11   got word and if he did I would know.  So my answer would have to

12   be if he did it wasn't very strong.  Because, in fact, I didn't

13   even know that Mr. Perez was pulled off the schedule, as I

14   mentioned previously, until Ms. Bowling told me.

15                           FURTHER EXAMINATION

16   BY THE INVESTIGATOR:

17       Q.    MAJ Antosh, do you believe there was retaliation --

18   did you retaliate against the Complainant in any way?

19       A.    No.

20       Q.    Because of his national origin?

21       A.    No.

22       Q.    Was it your intention to retaliate against him when he

23   was not selected for this position, this last position?

24       A.    No.

25                   THE INVESTIGATOR:  Okay.  Thank you, MAJ Antosh.

1  I appreciate the time.  We're going to go off the record for

2  right now.  The time now is 1:40.

3                    (Off the record.)

4             THE INVESTIGATOR:  COL Weaver, I won't hold you

5  very long, sir.  I know that your time is short and I'm going to

6  try to go real quick.  If there is anything that you don't

7  understand just say that you have no knowledge of that and we'll

8  move on to the next question.

9             COL WEAVER:  Just one second.  I'm going to lower

10 this receiver and put you on a hands-free.  Is that okay?

11            THE INVESTIGATOR:  That's fine.

12            COL WEAVER:  There is nobody in the room but me.

13            THE INVESTIGATOR:  That's fine, and you're on

14 conference call.

15            COL WEAVER:  Okay.  All right.  Lynn, you got me?

16            THE INVESTIGATOR:  Okay, great.  COL Weaver,

17 again, my name is Lynn Smith.  I'm a federal investigator out of

18 D.C. with the Office of Investigative Resolution Division, IRD.

19            COL WEAVER:  Yes, sir.

20            THE INVESTIGATOR:  And there has been a complaint

21 of discrimination filed by Mr. Gilberto Alvarez on several

22 incidents where your name has come up as a potential witness.  I

23 want to start off by just asking you some general questions

24 first.  Oh, I'm sorry.  I'm going to ask you if you can raise

25 your right hand.  I'm going to swear you in and just assume that

75

1    you are.

2              COL WEAVER:  I am.  Go ahead.

3                        COL GREGORY WEAVER,

4    having been first duly sworn, testified as follows.

5                          EXAMINATION

6    BY THE INVESTIGATOR:

7        Q.   COL Weaver, could you please state your full name for

8    the record?

9        A.   Gregory Weaver, Colonel U.S. Army.

10       Q.   Is that full-bird colonel?

11       A.   Yes, sir.

12       Q.   Sir, could you give me your complete title, your

13   position?

14       A.   Sure.  At the present time I'm chief of physical

15   therapy services at Brooke Army Medical Center, joint base San

16   Antonio, Fort Sam Houston, Texas.

17       Q.   And how long have you been in that position?

18       A.   I got here -- I think I signed in 18 June 2014.

19       Q.   Okay.

20       A.   So about three or four months here.

21       Q.   Okay.  And prior to that?

22       A.   Prior to that, sir, I was chief of the Department of

23   Orthopedics & Rehab there at Fort Hood, Texas.

24       Q.   And for how long?

25       A.   I was for a little -- about 18 months about.

1     Q.   Okay.  And do you know the Complainant, Mr. Gilberto

2  Alvarez?

3     A.   I do, sir.

4     Q.   And how do you know him?

5     A.   Sir, he was one of the orthotists in our brace shop

6  there at Fort Hood within the department of orthopedics.

7     Q.   Okay.  What was your position in the chain of command?

8  Where were you in his --

9     A.   In his rating scheme?

10     Q.   Sir?

11     A.   In his rating scheme?

12     Q.   Yes, please.

13     A.   How did I fit into his rating scheme?

14     Q.   Right.  Were you, like, second-line supervisor, third

15  line?

16     A.   Roger.  I think -- let's see.  Mr. Spell -- when

17  Mr. Spell was there Mr. Spell was his rater and -- no, the chief

18  of orthopedics probably was his senior rater and then me so

19  probably, like, third line.

20     Q.   Okay.  And the chief, are you thinking that was who,

21  MAJ Antosh?

22     A.   No.  At that time it would have been -- when Mr. Spell

23  was there it would have been -- chief of orthopedics would have

24  been Dr. Gloystein -- Dr. Dave Gloystein.

25     Q.   Okay.  All right.

USA-Alvarez-001916

1    A.    And so when Mr. Spell -- and I suspect you know a

2 bunch of what I'm going to say, but Mr. Spell was dealing with

3 some family medical issues so he was on FMLA kind of the last

4 eight or 10 or 12 weeks before he retired.  And so once he

5 retired, then we named Dr. Antosh to be chief of the brace shop.

6 The chief of orthopedics would have been Waterman -- Dr. Scott

7 Waterman.

8    Q.    Okay.  Who was your immediate supervisor?

9    A.    Would have been the DCCS Roger Gallup, COL Roger

10 Gallup.

11    Q.    And his title -- and DCCS stands for?

12    A.    Deputy commander for clinical services.

13    Q.    And that was his title as well?

14    A.    Right.  Deputy commander for clinical services at Carl

15 R. Darnell Army Medical Center.

16    Q.    And what did you say his grade was?

17    A.    Colonel full-bird.

18    Q.    Okay.  Thank you.  How long were you supervised by

19 him?

20    A.    My entire time there, sir.

21    Q.    All right.  Thank you.  I didn't ask you.  I need to

22 go back and ask you.  For the record, could you please state

23 what your national origin is?

24    A.    My national origin?  I guess I'm a white guy, Anglo.

25    Q.    Okay.  All right.  Thank you.

1      A.    Yes, sir.

2      Q.    Were you aware of Mr. Gilberto -- of Mr. Alvarez's --

3   I'm going to be referring to him as the Complainant.  Were you

4   aware of his national origin?

5      A.    I mean, you can make inferences based on his

6   appearance, but no, I didn't ever ask him what his origin was.

7      Q.    Okay.  You kind of anticipated the question there a

8   little bit.  That was going to be my next question.  Do you

9   believe his national origin to be Hispanic because of sight?

10     A.    Because of sight, yes.

11     Q.    Okay.  Thank you.

12     A.    You bet.

13     Q.    The Complainant indicates he was subjected to a

14   hostile work environment on the basis of his national origin,

15   Hispanic, that he was discriminated against when on April the

16   14th, 2014 he received an e-mail from MAJ Antosh that a provider

17   from California had been selected for the position of

18   Supervisory Orthotist/Prosthetic.  I believe this is

19   Mr. Christianson.  Did you have anything to do with that or did

20   you have any knowledge of that?

21     A.    No knowledge of that, sir.

22     Q.    Okay.

23     A.    I do -- I tell you what I did know.  I knew that when

24   Mr. Spell retired it was during the period of sequestration and

25   financial austerity so we were not allowed to hire and so I knew

USA-Alvarez-001918